IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

STANFORD L. BURRIS,                )
                                   )
            Plaintiff,             )
                                   )
      v.                           )        C.A. No.: 04-1496
                                   )
RICHARDS PAVING, INC.              )
                                   )
            Defendant.             )

**PLAINTIFF'S APPENDIX IN SUPPORT OF PLAINTIFF'S ANSWERING BRIEF IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

GARY W. ABER (DSB #754)
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
(302) 472-4900
Attorney for Plaintiff

DATED:  August 18, 2006

## TABLE OF CONTENTS

|  | Page No. |
|---|---|
| Amended Complaint | B1 |
| Answer to Amended Complaint | B6 |
| Charge of Discrimination | B8A |
| Delaware Department of Labor Notice of Reasonable Cause Finding | B9 |
| Deposition Excerpts of Stanford Burris | B11 |
| Deposition Excerpts of David Moluski | B36 |
| Deposition Excerpts of Jeffrey Thompson | B48 |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STANFORD L. BURRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.: 04-1469 |
| | ) | |
| RICHARDS PAVING, INC., a Delaware | ) | |
| Corporation | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT

### THE PARTIES

1. The plaintiff, Stanford L. Burris (hereinafter referred to as "Burris"), is a resident of the State of Delaware, residing in New Castle County.

2. The defendant, Richards Paving, Inc., is a corporation organized and existing under the laws of the State of Delaware, whose agent for service of process is S.D.M. Robinson Corporate Agents, Inc., 910 Foulk Road, Suite 200, Wilmington, DE 19803.

3. At all times relevant, Richards Paving, continually did, and now has fifteen (15) or more employees for each working day of the twenty (20) or more calendar weeks in the current or preceding calendar year.

4. At all times relevant, Richards Paving, has continually been engaged in an industry affecting commerce, within the meeting of the ADA, §101(5), 42 U.S.C. §12111(5), and ADA, §107(a), 42 U.S.C. §11217(a), which incorporates by reference §701(g)-(h) of Title VII, 42 U.S.C. §§2000e(g)(h).

5. At all times relevant, Richards Paving, has been a covered entity under the ADA §101(2), 42 U.S.C. §12111(2).

**B1**

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the "Americans With Disabilities Act" claims pursuant to 28 U.S.C.§1331 and 28 U.S.C. §1343. This Court has jurisdiction over ancillary matters pursuant to 28 U.S.C. §1367.

7. This action is authorized and instituted pursuant to §107(a) of the "Americans With Disabilities Act" of 1990 ("ADA") (42 U.S.C. §12101 et. seq, which incorporates by reference §706(f)(1) & (3) of the Civil Rights Act of 1964 ("Title VII"), and 42 U.S.C.§§2000e-5(f)(1)(3), and pursuant to §102 of the Civil Rights Act of 1991, 42 U.S.C.§1981(a).

8. Venue for all causes of action stated herein lies in the District of Delaware, under 28 U.S.C.§1331, and the acts alleged as the basis for these actions took place within the boundaries of this district, although facts relevant to these proceedings may have also taken place in the State of Maine.

## PREREQUISITES

9. The plaintiff, Stanford Burris, has met the prerequisites for filing suit under the ADA. On May 9, 2003, Burris filed a charge "The Charge" simultaneously with the Delaware Department of Labor and the Equal Employment Opportunity Commission, alleging that he had been discriminated against in violation of Title I of the ADA. (A copy of that charge is attached hereto as Exhibit No. 1)

10. On April 30, 2004, the Delaware Department of Labor issued a "Notice of Reasonable Cause Finding", stating that there was reasonable cause to believe that there was a violation. (A copy is attached hereto as Exhibit No. 2)

**B2**

11.    On August 27, 2004, the Equal Employment Opportunity Commission issued a "Notice of Right to Sue" based upon the request of the plaintiff. (A copy of that notice is attached hereto as Exhibit No. 3).

12.    The plaintiff has filed this suit within 90 days of the receipt of his "Notice of Right to Sue" having received such notice on or about August 30, 2004, and this suit having been originally filed on November 24, 2004.

## FACTUAL ALLEGATIONS

13.    The plaintiff applied for a position as a truck driver with the defendant on or about April 3, 2003.

14.    As a result of that application the plaintiff was interviewed by employees of the defendant.

15.    On May 5, 2003, as a part of the process to apply for a position, the plaintiff was given a road test, which he passed.

16.    After passing his road test, the defendant's employee representatives asked the plaintiff for a copy of his driving record.

17.    On May 6, 2003, when the plaintiff delivered a copy of his driving record to the defendant, he was told he would not be hired, because of the defendant's perception that the plaintiff could not communicate with the offices of the defendant while operating the defendant's trucks, through the use of a CB radio or a cell phone.

18.    At all relevant times the plaintiff would have been capable, with or without reasonable accommodation to perform the essential function of the position of truck driver.

19.    The plaintiff was substantially limited in the major life function of breathing because of injuries to his larynx, which also prevents him from talking in a normal fashion.

**B3**

20.    Prior to applying for a position with the defendant, the plaintiff had previously been employed as a truck driver, and had been able to communicate with truck dispatchers through the use of a CB radio and/or cell phone.

21.    As a direct and proximate result of the actions of the defendant in denying employment to the plaintiff, the plaintiff has suffered significant financial losses, including, but not limited an earned income.

22.    As further and direct proximate result of the defendant's discriminatory conduct, the plaintiff has suffered severe emotional distress, humiliation, emotional pain and suffering, mental anguish and other non-pecuniary losses.

23.    The actions of the defendant in failing to hire the plaintiff and/or to make necessary and reasonable accommodation for the plaintiff's disability, were in violation of the "Americans With Disabilities Act", 42 U.S.C. §12112(b)(5)(a).

24.    The actions of the defendant in failing to hire the plaintiff were based upon the defendant's discrimination of the plaintiff, because the plaintiff has a disability, the plaintiff is was regarded as being disabled, and/or the plaintiff's record of having a disability, all of which were discriminatory in nature.

25.    At all times herein the actions of the defendant have been committed in bad faith.

26.    The defendant, by its actions, willfully, maliciously and intentionally with reckless indifference discriminated against the plaintiff in violation of the "Americans With Disabilities Act", 42 U.S.C. §11212, and in doing so is subject to punitive damages.

WHEREFORE, the plaintiff requests this Court to award the following:

a.    Award both past lost wages and future lost wages, constituting such damages as the Court deems appropriate.

**B4**

b.    Direct the defendant to pay plaintiff reasonable sums of money to compensate the plaintiff for his pain and suffering.

c.    Direct the defendant to pay the plaintiff reasonable sums as punitive and exemplary damages.

d.    Award the plaintiff his attorney fees, litigation expenses, and all reasonable Court costs.

e.    Award injunctive and equitable relief in the form of an order directing the defendant to hire the plaintiff, as well as front pay.

f.    Such other and further relief as this Court deems just and appropriate.

ABER, GOLDLUST, BAKER & OVER


_____/s/ Gary W. Aber_____
GARY W. ABER (DSB #754)
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
(302) 472-4900
Attorney for Plaintiff

DATED:  September 7, 2005


**B5**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

Stanford L. Burris                    :
                                      :
      Plaintiff,          :
                                      :       Civ. No. 04-1469-SLR
v.                                    :
                                      :
Richards Paving, Inc.                 :
                                      :
      Defendant          :


## ANSWER OF DEFENDANT RICHARDS PAVING, INC., TO PLAINTIFF'S AMENDED COMPLAINT

1.     Upon information and belief, admitted.

2.     Upon information and belief, admitted.

3.     Upon information and belief, admitted.

4.     Upon information and belief, admitted.

5.     Upon information and belief, admitted.

6.     Upon information and belief, admitted.

7.     Upon information and belief, admitted.

8.     Upon information and belief, admitted.

9.     Upon information and belief, admitted.

10.    Upon information and belief, admitted.

11.    Upon information and belief, admitted.

12.    Upon information and belief, admitted.

13.    Defendant is without knowledge or information sufficient to form a belief as to the truth of this averment.

**B6**

14.   Defendant is without knowledge or information sufficient to form a belief as to the truth of this averment.

15.   Defendant is without knowledge or information sufficient to form a belief as to the truth of this averment.

16.   Defendant is without knowledge or information sufficient to form a belief as to the truth of this averment.

17.   Denied.

18.   Denied.

19.   Defendant is without knowledge or information sufficient to form a belief as to the truth of this averment.

20.   Defendant is without knowledge or information sufficient to form a belief as to the truth of this averment.

21.   Defendant is without knowledge or information sufficient to form a belief as to the truth of this averment.

22.   Denied.

23.   Denied.

24.   Denied.

25.   Denied.

26.   Denied.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

27.   The Complaint fails to state a claim upon which relief can be granted

### SECOND AFFIRMATIVE DEFENSE

28.   Plaintiff failed to mitigate his damages.

### THIRD AFFIRMATIVE DEFENSE

29.   Plaintiffs' claims are barred, in whole or in part, by the doctrines of laches, estoppel and waiver.

**B7**

## FOURTH AFFIRMATIVE DEFENSE

30.    Plaintiffs' complaint fails to state a claim of disability discrimination.

## FIFTH AFFIRMATIVE DEFENSE

31.    Plaintiffs' claims are barred, in whole or in part, by the doctrine of statute of limitations.

## SIXTH AFFIRMATIVE DEFENSE

32.    Pursuant to 42. U.S.C. § 12113(a), plaintiff was not hired by Richards Paving for job related reasons and consistent with business necessity.

## SEVENTH AFFIRMATIVE DEFENSE

33.    Pursuant to 42 U.S.C. §12113(b), plaintiff posed a direct threat to the health and safety of other individuals in the workplace.


**WHEREFORE** defendant Richards Paving, Inc., demands that this case be dismissed with prejudice.


ELZUFON AUSTIN REARDON
TARLOV & MONDELL, P.A.


/s/ Matthew P. Donelson
Matthew P. Donelson, Esquire
Del ID # 4243
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899-1630
(302) 428-3181
Attorney for Defendant
Richards Paving, Inc.

DATED: 09/29/05

**B8**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

| ENTER CHARGE NUMBER | |
|---|---|
| ☐ FEPA | 06031071 |
| ☐ EEOC | 17CA30041 |

Delaware Department of Labor            and EEOC

(State, or local Agency, if any)

| NAME (Indicate Mr., Mrs., Ms) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Stanford L. Burris | (302) 658-2706 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 88 Karlyn Dr. | New Castle DE 19720 | NCC |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (*If more than one, list below.*)

| NAME | NO. OF EMPLOYEES OR MEMBERS | TELEPHONE NUMBER (Incl. Area Code) |
|---|---|---|
| Richard Paving Inc. | 20+ | 302-328-5828 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 9 Bellecor Dr. | New Castle, DE 19720 |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☐ RETALIATION ☒ DISABILITY ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | 4/3/2003 |
| LATEST | 5/6/2003 |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

I applied for a truck driving position on or about 4/3/03 with the Respondent. I am an individual with a disability who is able to perform the essential functions of the position with reasonable accomodation. I went to see the Respondent on 5/5/03 to inquire whether the position was still available. I spoke to Dave McLaskley, Foreman and he gave me a road test. I passed the road test and then Mr. McLaskley asked for my driving record. I returned on 5/6/03, with a copy of my driving record but was told that he could not hire me because of my voice. Mr. McLaskley stated that I would not be able to be heard over the CB radio. I mentioned that I could use a cell phone to communicate and I could use my artificial larynnx(which I showed him) but Mr. McLaskley refused. Lastly, I asked Mr. McLaskley if I could be placed in a laborer position but he told me that couldn't be done because he needed truck drivers.

I believe that I have been discriminated against in violation of the Americans with Disabilities Act of 1991, as amended and the Delaware Handicapped Persons in Employment Act based on my disability because: I was not hired for a position for which I was qualified clearly based on my disability. Mr. McLaskley refused to provide me reasonable accomodation and therefore, refused me a position for which I could perform.

| ☒ | I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT |
|---|---|---|
| | | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

| I declare under penalty of perjury that the foregoing is true and correct. | NOTARY - (When necessary to meet State and Local Requirements) |
|---|---|
| Stanford L Burris | |
| Date 5-9-03        Charging Party (Signature) | Subscribed and sworn to before me this date        (Day, month, and year) |

EEOC FORM 5        PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED
REV 6/92

**B8A**



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

## NOTICE OF REASONABLE CAUSE FINDING

<u>RE: Burris v. Richards Paving Inc.</u>                 <u>State Case No.: 03061071</u>

On May 9, 2003, <u>Mr. Stanford Burris</u> filed a Charge of Discrimination against <u>Richards Paving, Inc.</u> The Charge of Discrimination is hereby incorporated by reference.

<u>Reasonable Cause Finding</u>:

On April 30, 2004, the Department of Labor concluded its investigation and now finds, based on the following facts, that there is reasonable cause to believe that a violation of the State Discrimination Act has occurred.

I.      <u>Undisputed Facts</u>:
1. Charging Party applied for a Truck Driver position with Respondent on or about 04/03/03.
2. Respondent had an interview with Charging Party where the interviewer and Charging Party attempted to communicate using both a CB radio and a cell phone in an attempt to find a reasonable accommodation to Charging Party's disability.
3. Respondent did not hire Charging Party for this position.

II.     <u>Disputed Facts</u>:
1. Charging Party states that the representative of Respondent stated Charging Party was not being hired because of his voice. Respondent further stated that Charging Party could not be heard over the CB radio and therefore could not be hired as a Truck Driver.
2. Respondent claims that attempts were made at the interview to communicate with Charging Party over the CB radio and cell phone and were unsuccessful.
3. Respondent states that there were no accommodations that could have been made for Charging Party and of those accommodations, which could have been a possibility, they would have caused Respondent an undue hardship.

III.    <u>Resolution of Material Facts in Dispute</u>:

1. Charging Party has currently been employed by a trucking company for a period of 6 months where he used and communicated with a CB radio successfully.

**B9**

2. Respondent was unable to demonstrate that there are no accommodations that could have been made.

3. Respondent failed to provide evidence that the reasonable accommodations that could have been utilized would have caused an undue hardship.

4. Respondent corroborated that in their business there is a limited amount of deliveries of their products that are delivered without complications and that these deliveries could be delivered by Charging Party.

IV.    Resolution:

1. Charging Party met his burden of showing that he was discriminated against based on his disability.

The Charge of Discrimination, State Case No. 03061071 will be administratively processed and assigned to a conciliation officer in an effort to administratively resolve the complaint pursuant to 19 *Del. C.* Section 712(c).

5/30/04
DATE

MELINDA SHELTON
INVESTIGATOR
LABOR LAW ENFORCEMENT OFFICER

4/30/04
DATE

JULIE CUTLER
LABOR LAW ENFORCEMENT SUPERVISOR

**B10**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Stanford L. Burris                :
                                  :
      Plaintiff,                  :
                                  :    C.A. No.
      v.                          :    04-1469-SLR
                                  :
Richards Paving, Inc.             :
                                  :
      Defendant.                  :


            Deposition of STANFORD L. BURRIS,

taken pursuant to notice before Adam D. Miller,

Registered Professional Reporter and Certified

Shorthand Reporter, in the law offices of Elzufon

Austin Reardon Tarlov & Mondell, P.A., 300 Delaware

Avenue, Suite 1700, Wilmington, Delaware, on

Wednesday, June 14, 2006, beginning at approximately

9:57 a.m., there being present:

APPEARANCES:

            ABER, GOLDLUST, BAKER & OVER
              One Customs House, Suite 600
              702 King Street
              P.O. Box 1675
              Wilmington, Delaware 19899-1675
            BY:  GARY W. ABER, ESQUIRE
            Attorney for Plaintiff


                  CORBETT & WILCOX
            Registered Professional Reporters
      230 North Market Street     Wilmington, DE 19801
                  (302) 571-0510
              www.corbettreporting.com

1  for a building:  sand, stone, blacktop, so on.

2          Q.   Sir, do you have a current CDL license?

3          A.   Yes, I do.

4          Q.   Do you have it with you right now?

5          A.   No, I don't.

6          Q.   How often do you have to get that renewed?

7          A.   Every seven years -- every five years.

8  Scratch that.  I can't remember off the top of my

9  head right now.

10          Q.   Do you remember the last time you got it

11  renewed?

12          A.   I think it was 2002, I think.

13          Q.   When you go to get it renewed, do you have

14  to take another test to get it passed?

15          A.   If I'm getting another qualification, I

16  do.

17          Q.   What if you're not getting another

18  qualification?

19          A.   No.

20          Q.   Then you don't have to take any other

21  additional tests?

22          A.   I did take a test for bus driver.

23          Q.   When was that?

24          A.   2003.

Page 9

1    Q.   Did you pass that test?

2    A.   Yes.

3    Q.   When did you first get your CDL license?

4    A.   I'm 64.  I think I got it when I was 21, I

5  think, so do the math.  I can't think.

6    Q.   So you've roughly had it for about 20

7  years?  You've roughly had your CDL license for about

8  20 years?

9    A.   I'm 64; 40-some years.

10    Q.   I'm sorry.  My math is bad.  That's why

11  I'm an attorney.

12    A.   Mine's terrible.  I didn't even want to

13  try to count it.

14    Q.   Sir, I'm going to turn your attention to

15  your application for employment with Richards Paving.

16    A.   Refresh me.  That was almost three years.

17  I can't remember.

18    Q.   I'm going to ask you the questions, so you

19  just answer me to the best of your recollection.

20    A.   Okay.

21    Q.   Do you recall applying for a job with

22  Richards Paving?

23    A.   Yes.

24    Q.   How many times have you applied for a job

**B13**

Page 13

1    interviewed that same day.

2        Q.    So just so I'm clear, you went in to fill

3    the application out, and you had the interview on

4    that same day as well?

5        A.    To the best of my knowledge.

6        Q.    The secretary who gave you the

7    application, do you recall her name?

8        A.    No, I do not.

9        Q.    Do you recall what she looked like?

10       A.    She was a Caucasian lady, I'd say

11   approximately in her mid 20s or early 30s, I think,

12   to the best of my knowledge.

13       Q.    Did you give the application back to her

14   on that day?

15       A.    No.  She took it.  To my -- as I said -- I

16   mean, I'm trying to remember.  I think she took it.

17   She told me to have a seat.  To the best of my

18   knowledge, I believe she took it and -- to somebody

19   to, to look at.

20       Q.    You testified that you believe you were

21   interviewed that day.  Do you recall who you met with

22   on that day?

23       A.    I believe it was a guy named Dave.

24       Q.    And what do you mean by "interviewed"?

Corbett & Wilcox

**B14**

1   What did you do during the interview process?

2       A.   He sat down and looked over my

3   application, and he said he was going to road-test

4   me.

5       Q.   Did he ask you any questions at that time?

6       A.   I don't remember.

7       Q.   I understand you carry an electronic, what

8   I'm going to term as an electronic voice box?

9       A.   (Indicating.)

10      Q.   No?

11      A.   No, sir.  I didn't have it that day.

12      Q.   Okay.  I'm going to get back to that, but

13   I do understand that you have one; is that correct?

14      A.   Yes, I do -- I did have one.

15      Q.   You no longer use -- have one?

16      A.   I've not used it, actually, since '91 or

17   '92.

18      Q.   I understand you had your surgery to

19   remove the larynx in 1991; is that correct?

20      A.   That's correct.

21      Q.   So would I be correct in saying that you,

22   since 1991 or 1992, you have not used what I'll term

23   the electronic voice box?

24      A.   That's correct.

**B15**

1    with your voice?

2         A.    Sure, it do.  I have an opening in my

3    neck.  I'd drown if I tried to swim.

4         Q.    So what do you mean when you say "yes,"

5    you consider yourself --

6         A.    I'm sorry.  Is there anything that we can

7    do -- I try not to think about this.  Please let's

8    move on to something else, because it really does

9    upset me because I don't like the way I sound.  I

10   don't like what happened.  Please.  I get emotional.

11   Because of all the trouble I went through, I don't

12   want to -- I really don't want to talk about it.

13        Q.    Well, sir, I have to ask you these

14   questions.  And, believe me, I'm not trying to upset

15   you, but I need to ask you these questions.

16             When you said "yes," how do you

17   consider yourself disabled, other than you can't

18   swim?

19        A.    I said "yes and no."

20        Q.    What do you mean by when you say "yes"?

21        A.    Yes, I can't do everything that a normal

22   person do.  Some words I can't pronounce as good as

23   other people.  And I said "no" because any type of

24   work, I can do.

**B16**

Page 21

1    Q.   Sir, work-wise, you don't consider

2  yourself disabled?

3    A.   Well, I don't.  But a lot of the employers

4  consider me as disabled.  The facts on this case --

5  when the, the personnel from, from Richards said that

6  they couldn't use me because of my voice -- answers

7  the question right there.

8    Q.   You said other -- you said you don't

9  consider yourself disabled, but other, I guess,

10  employees or employers do.  What other employers have

11  considered you disabled?

12    A.   I can't even name them because I have been

13  filling applications and applying to jobs; maybe

14  somebody would hire me.  I'd start talking, and that

15  would be it.

16    Q.   Do you have any specific names of certain

17  companies that you've applied to and believe they

18  haven't hired you because of your voice?

19    A.   You got evidence right in your records.

20  Richards said -- the defendant said that they can't

21  use me because of my voice.

22    Q.   I understand you're saying Richards.  Is

23  there any other companies that you can recall that

24  have --

**B17**

1    A.   Not that have just come out and said, "I

2    can't use you because of your voice."  They just say

3    that the job's no longer available.

4    Q.   Let's talk about the interview process.

5    How long were you interviewed by Mr. Dave Moluski?

6    A.   I don't remember exactly how long.

7    Q.   You don't know how long the interview

8    process was.  What did you do during the interview

9    process?

10   A.   I answered all the questions that he asked

11   me.  But I don't remember what the questions were

12   right now.

13   Q.   You said you took a driving test.  Do you

14   recall that?

15   A.   Yes.

16   Q.   How long -- how far did you drive; do you

17   recall?

18   A.   I don't remember everything.  I'd say

19   maybe about five to ten miles.

20   Q.   What type of vehicle were you doing your

21   driving test in?

22   A.   A Mack Truck.

23   Q.   You'll have to forgive my ignorance.  Is

24   that like a dump truck?  Is that like a pickup truck?

Page 23

1      A.    It's a Mack dump truck, a ten-wheeler.

2      Q.    Have you driven that type of truck before?

3      A.    Yes, I have.

4      Q.    Prior to this interview process, when was

5   the last time you drove a ten-wheeler Mack Truck?

6      A.    Probably when I worked for Rocky Paving

7   Company.  But also I pulled a trailer with equipment

8   on it when I worked for Rocky.  But I had to back the

9   trailer, the truck and trailer into driveways, into

10  alleys.

11     Q.    During your driving test, did Mr. Moluski

12  have a certain route for you to take or did he just

13  tell you to drive the truck?

14     A.    Yeah.  He told me -- I think we, I think

15  we went, we went to 141 and made that circle and came

16  back to the plant, as far as I remember.

17     Q.    Was anybody else in the vehicle besides

18  you and Mr. Moluski?

19     A.    That's only three seats in there.

20     Q.    During the driving test while you were out

21  on the road, did you have any conversation with

22  Mr. Moluski?

23     A.    Not really.  I just asked him which, which

24  way he wanted me to go, the route that he wanted me

Stanford L. Burris

1    to take.

2         Q.    Now, this ten-wheeler truck, I presume

3    that's a standard shift?

4         A.    Yeah.  I think it's a "maxi nine."  I

5    think it's -- to my knowledge, I think it only had a

6    high and low in it.

7         Q.    Did you have to use the radio during the

8    driving test?

9         A.    No.  I wasn't asked to use the radio.  As

10   a matter of fact, that truck didn't have a radio in

11   it or a CB -- that I can remember.  But I was never

12   asked to speak on a CB.

13        Q.    When you got back to the facility, what

14   happened next?

15        A.    He told me that, that my -- the road test

16   was successful and that he needed to see a copy of my

17   driving record.

18        Q.    Did you have that with you at the time?

19        A.    No, I didn't.

20        Q.    Did he ask you for any other documents

21   besides your driving record?

22        A.    Well, I think he looked at -- if I'm

23   correct, I think he asked for -- I don't remember for

24   sure -- but he might have asked me if I had, if I had

**B20**

Page 25

1    my certification for DOT.

2         Q.   Did you have that with you as well?

3         A.   Yes, I did.  But I don't know if he ever

4    asked me for that or not.  I can't remember that.

5         Q.   Did you ever give him a copy of the

6    certification that you had?

7         A.   I can't remember.  I don't believe that he

8    ever asked for the, for a copy.

9         Q.   What happened after you -- after he asked

10   you for a copy of your driving record?

11        A.   Well, I, I went to the Department of Motor

12   Vehicles so I could have one printed.  I came back

13   the next morning with it.  That's when he was telling

14   me that he couldn't use me because of my voice.

15        Q.   Did Mr. Moluski ask you to come back the

16   next morning?

17        A.   Yes; because he said he wanted to see a

18   copy of my driving record.

19        Q.   Were there any other people around while

20   you and Mr. Moluski were having this discussion?

21        A.   Not that I can remember.

22        Q.   Where was -- you don't recall where this

23   discussion was taking place?  I understand it was a

24   plant.  But was it in a particular part of --

1      A.   I think it was in his office, I believe,

2  to the best of my knowledge.

3           Wait a minute.  Wait a minute.  I

4  believe it was on the outside, because he was

5  interviewing another -- there was somebody else there

6  that he was talking to.  And this guy was -- he was

7  way across the other side of the yard at the time.

8           I think he told me that at the yard,

9  standing outside.  I believe that's where it was at.

10  Because we did have a conversation on the outside.

11  Or maybe that's when I was begging him for the job.

12  I'm not sure.

13      Q.   You said you were begging him for the job.

14  What do you mean by that?

15      A.   Well, after he told me that he couldn't

16  use me because of my voice, when I asked him, I said,

17  Well, if, if you can just hire me, just give me any

18  kind of job.  I'll take any kind of work.

19           And he said no.

20           But I -- that's when, that's when the

21  cell phone and the electric larynx came up, because,

22  like I said, I would have done anything to try to get

23  that job because it paid pretty good and it was

24  almost steady work.

Page 27

1    Q.   I want to backtrack for a second, because

2    I'm getting a little confused between -- was this on

3    the first day or the second day that you had this

4    conversation?

5    A.   This was on second day, the conversation

6    about the, he didn't tell me that until after I went

7    to the Department of Motor Vehicles, that he couldn't

8    use me because of my voice.

9            That's when we got into a conversation

10   about the, about I could bring my larynx or -- my

11   electric larynx or the cell phone.  But he said no,

12   he didn't want neither one of them.

13   Q.   I understand that, and I'm going to get

14   into that.  And I want to just keep the chronology

15   straight.  I understand that you went for an

16   interview; you took the road test.  On that first

17   day, where were you speaking with Mr. Moluski when

18   you had the discussion about the driving record and

19   your certification?

20   A.   This was after we came back.  I don't, I

21   don't really believe that he asked me for my

22   certification.  I don't believe.  I'm not sure.

23   Q.   But you believe he asked you for your

24   driving record?

1   time, the second application -- strike that.

2               We're talking about the current time,

3   in 2003.  I understand that you came back the next

4   day after you took the road test and did the

5   interview?

6        A.   (The witness shook his head.)

7        Q.   No?  Why don't you tell me what happened.

8        A.   The interview was that day, the first day.

9        Q.   Correct.

10       A.   And the driving test was the first day.

11       Q.   Correct.

12       A.   When he told me to get -- he wanted to see

13   the driving record.  I did not have a copy of the

14   driving record with me.  I had to go into the DMV the

15   next day to get a copy.

16               I returned with the copy.  And before

17   he even looked at the copy, he said, "I can't use you

18   because of your voice."

19       Q.   What time did you go to the DMV?

20       A.   I went the next day.  I don't remember.

21       Q.   What time did you get to Richards Paving?

22       A.   I don't remember.  I know it was during

23   the day.

24       Q.   Do you believe it was in the afternoon or

1    seemed like we were outside, just me and him.  And

2    when he told me that, I don't know if I went in or

3    not.  But I remember him saying to me he couldn't use

4    me because of my voice.

5            Q.    At any time on the second day did he ask

6    you to use the radio or the CB?

7            A.    No, not to the best of my knowledge.

8            Q.    So tell me what happened up until you left

9    Richards Paving.

10           A.    Well, I called back three or four

11   different times, but he never would come to the

12   phone.

13           Q.    At some point in that second meeting, I

14   understand that you said that the issue of your voice

15   came up.  Who brought that issue up?

16           A.    Dave is the one that said -- when I came

17   back with the, with my driving record from DMV,

18   that's when he told me that he couldn't use me; he

19   couldn't hire me because of my voice.  He didn't

20   think that I could be -- it would be clear enough

21   over the CB.

22           Q.    And what did you say to him?

23           A.    That's when I told him that I could use my

24   electric larynx or my cell phone to communicate.  And

Stanford L. Burris

Page 33

1   he said no, that's not acceptable.

2        Q.   At either the first or second day you met

3   with Dave Moluski, did you have your electric larynx

4   with you?

5        A.   No, I did not.

6        Q.   Any other discussions between you and Dave

7   on that second day?

8        A.   Yeah.  I told him that, that I needed a

9   job, because I was about to lose my house and all my

10  bills were behind.  And I needed a job and I would

11  work as a laborer or any capacity that he had open, I

12  would take it.  I didn't have to drive a truck.

13       Q.   Was that the last time you had any

14  discussions with Dave Moluski?

15       A.   Yeah, personally, because every time I

16  would call after that, they would say he was either

17  out of the office or he was on the phone.

18       Q.   On that second day when you had your

19  driving record with you, did you actually give that

20  to him or did he accept that from you?

21       A.   I'm not sure.  I think he did.  I'm not

22  sure.

23       Q.   Sir, other than speaking, does your larynx

24  cause you any other problems?

1      A.    (Indicating.)

2      Q.    Do you have any other problems stemming

3  from your larynx other than your soft speech?

4      A.    That's all I can think of.

5      Q.    Between the interview you had with

6  Richards Paving and your current job with Daisy

7  Construction, have you held any other jobs since

8  then?

9      A.    No.

10     Q.    No?  Okay.  Sir, I'm just going to show

11 you your Answers to Interrogatories.  I'm going to

12 ask if that is your signature on this page.

13     A.    Yeah, to the best -- yes.

14     Q.    And did you review your Answers to

15 Interrogatories before you signed them?

16     A.    Some of them.

17     Q.    But not all of them?

18     A.    I think I did.  I'm not sure.  It's been a

19 while back.

20     Q.    Okay.  And your Answers to

21 Interrogatories, you answered them to the best of

22 your ability and knowledge?

23     A.    Yes.  Yes, to the best of my knowledge.

24     Q.    Prior to today's deposition, did you do

**B27**

Stanford L. Burris

Page 45

1    referring to this litigation?

2          A.   Yes.

3                (Discussion held off the record.)

4    BY MR. DONELSON:

5          Q.   Sir, I just want to clear up something as

6    far as your CDL license.  I understand that you got

7    it when you were 24 years old --

8          A.   (The witness shook his head.)

9          Q.   No?

10         A.   21.

11         Q.   21 years old.  My apologies.

12               -- and that the State of Delaware does

13   not require you to take a driving test for each

14   renewal; is that correct?

15         A.   It all depends what I'm certified for.  I

16   first got certified for driving a tractor-trailer.

17   That's what I first started driving.  And dump truck,

18   I wasn't, I didn't have to be, take any of the

19   written tests for the Department of Motor Vehicles.

20               But when I went to get endorsed for a

21   bus driver for a school bus or a charter bus, I had

22   to have a driving test.

23               And I tried, when I was off this

24   winter, I applied to a company called Wally Trucking

**B28**

1    Company in New Jersey.  I had to take a road test in

2    a tractor-trailer, which I passed.

3        Q.   Sir, you referenced earlier your cell

4    phone, that you sometimes use that to communicate; is

5    that correct?

6        A.   I use it all the time to communicate with

7    somebody.  If you're not in front of me, if you're

8    sitting there, then I don't call.

9        Q.   Do you have a -- what type of cell phone

10   is it?

11       A.   It's a regular cell phone.

12       Q.   You'll have to pardon my ignorance.  Do

13   you have your cell phone with you?

14       A.   Yes, I do.  It's just a regular cell

15   phone.  What's your office number?

16       Q.   So you would call the person that you're

17   trying to get ahold of?

18       A.   And they would call me.

19              (Discussion held off the record.)

20   BY MR. DONELSON:

21       Q.   Sir, I understand from your Answers to

22   Interrogatories that you've taken the test and been

23   examined for DOT certification in New Jersey; is that

24   correct?

**B29**

Page 47

1          A.    Yes.

2          Q.    Have you received the results of that?

3          A.    I have my wallet with me.  I do have, I do

4    have the copy that I got from -- no, I don't, I never

5    got it, because I didn't work for the company but one

6    day.

7          Q.    Do you know whether you passed that

8    certification?

9          A.    Yes, I passed it, because I worked one

10   day.

11               I'll add one more thing.  I've never

12   flunked a driving test.

13         Q.    Just a couple quick questions.  Going back

14   to the second day that you went back to Richards

15   Paving, did you have any conversation with the

16   receptionist or secretary, other than to ask for

17   Mr. Moluski?

18         A.    I don't remember.

19         Q.    Approximately how long do you believe you

20   were there on that second day at Richards Paving?

21         A.    Not long.

22         Q.    When you say "not long," would it have

23   been half an hour? less than half an hour? more than

24   a half hour?

Stanford L. Burris

Page 49

1    about this incident?

2           A.   I might have.  I don't remember.

3           Q.   Do you recall who you might have spoken

4    to?

5           A.   No, I don't remember.  If you want to

6    know, my -- I was really bruised because it started,

7    it brought me back to the realization that I was

8    different from everybody else.

9                When he said he couldn't use me,

10   couldn't hire me because of my voice, really, it

11   really floored me, because I was feeling good; but he

12   brought me, he just crashed my world when he said he

13   couldn't hire me because of my voice.  And I realized

14   that I really, truly do have a problem.

15          Q.   Sir, since you applied to Richards Paving

16   and before you got the job with Daisy Construction,

17   how many places did you apply for jobs?

18          A.   Good lord, I couldn't even say.  If I sat

19   here and gave you a number, I'd be lying to you

20   because I don't remember.

21          Q.   Would it have been more than ten? less

22   than ten?

23          A.   Oh, my God, yes, because I've been trying

24   to get jobs everywheres.

Corbett & Wilcox

**B30A**

Page 51

1    disability for a while.

2         Q.   Anything else?

3         A.   Family, friends, church.

4         Q.   How much do you get a month for

5    disability?

6         A.   I don't remember.

7         Q.   Were you on any unemployment during that

8    time?

9         A.   I can't remember.

10        Q.   Do you have any records that would help

11   your memory?

12        A.   No.

13        Q.   Do you have any stubs from any of the

14   disability payments or anything?

15        A.   No.

16             MR. ABER:  I believe what he's talking

17   about is a workers' compensation claim he had, but

18   that was well back before Richards Paving.

19             MR. DONELSON:  Sir, I believe those

20   are all the questions I have.

21             THE WITNESS:  Thank you.

22             MR. ABER:  I have one question.

23   BY MR. ABER:

24        Q.   Mr. Burris, I'm going to hand you a copy

**B31**

Page 53

1   other than Mr. Moluski?

2       A.   Oh, yeah, I remember, yeah.  I remember

3   now, yes.  The secretary -- I retake it back.  She

4   did say that I talked on the CB and that she could

5   understood -- understand what I said.  I remember

6   that now.

7                MR. ABER:  Thank you.  I have nothing

8   else.  We'll read and sign.

9                MR. DONELSON:  I'm just going to

10  redirect.  I'm --

11               MR. ABER:  Sorry.

12               THE WITNESS:  It's my fault.

13  BY MR. DONELSON:

14      Q.   Sir, I'm just trying to clarify this.  You

15  just testified to your attorney's questions that you

16  don't remember talking on the CB but you remember

17  having a conversation with the receptionist.

18               Is that your testimony?

19      A.   Yeah.  After I, after I reviewed the

20  records, because it's been since 2003.  I mean, there

21  has been so many other problems I've had:  losing my

22  property, everything being taken away.

23               It's kind of hard to remember

24  something that happened, what, three years ago?  I am

Stanford L. Burris

Page 55

1          A.    If the statement said I did, I did.  I

2    just don't remember; that's all.  But I do remember

3    it, having a conversation with the secretary now.

4          Q.    Okay.  What did you say on the CB, if

5    you --

6          A.    I don't remember.

7          Q.    Who did you speak to on the CB?

8          A.    The girl in the office.  It had to be

9    because we, we always called back to the base.

10         Q.    Well, on the second day, where were you

11   calling from that you were trying to reach the girl

12   in the reception area?

13         A.    I went into the office -- to make -- to be

14   honest with you, since we read the thing, I was at,

15   at Richards Paving now more than twice because I

16   went, because -- as I'm refreshed now, the girl did

17   tell me to come back.  She gave me the application.

18   I brought the application in, I believe.  That's when

19   I had the interview with a Dave or David.

20         Q.    I understand that.  We're talking about

21   the second day where you said you went back with the

22   driving record --

23         A.    Second day was all I did was give him the

24   driving record; that's when he said he couldn't use

B33A

Page 54

1    64 years old.  My memory's not as good as it used to

2    be.

3         Q.   Where was the CB that you were speaking

4    from.

5         A.   I don't remember exactly where.  But it

6    wasn't in the truck when we took the road test.  I

7    remember that.  Because it wasn't -- I don't remember

8    a CB being in the, in the truck.

9         Q.   And we're referring to the second day,

10   because you've already testified that you didn't use

11   the CB on the first day.  We're referring to the

12   second day.  My question is, where did you use a CB

13   on the second day?

14        A.   I don't think I used a CB on the second

15   day.  That's when I was told to bring a copy of my

16   driving record back, which I did.

17        Q.   And just so I'm clear, is it your

18   testimony that on the first or second day, you didn't

19   use a CB on either day?

20        A.   I remember after, after I saw the -- I

21   said I did.  So I guess I did.

22        Q.   Well, I'm not asking you if you guess you

23   did.  I'm asking you if your recollection says you

24   did.

**B33**

1   me because of the voice.

2        Q.   And the second day, you didn't use a CB on

3   the second day; is that correct?

4        A.   Not that I remember.  I think this was all

5   the first day, I believe.

6        Q.   The first day now, your testimony now is

7   that the first day you used a CB?

8        A.   That's when I think I used it because when

9   I gave him the driving record, he said he couldn't,

10  he couldn't use me.  He could have told me that

11  before I gave him the record; I'm not sure.

12       Q.   I apologize if I keep asking you the same

13  questions, because I'm just trying to make sure this

14  is clear, because it's starting to get muddled up for

15  me.

16            The first day, you've already

17  testified that there was no CB in the truck.  So

18  where would you have used the CB on the first day?

19       A.   I'm saying the truck that I was -- that he

20  road-tested me in.  It wasn't the same truck that I

21  used the CB in.  Because I think the truck that I had

22  used, he had said something about it had been to the

23  shop and the accelerator was sticking or something.

24  They had been working on it.  The next day -- I

1  BY MR. ABER:

2      Q.   You can answer.

3          MR. ABER:  Go ahead.

4          THE WITNESS:  It was in the yard.  It

5  was in the yard, because I didn't drive the second

6  day.

7  BY MR. ABER:

8      Q.   And was Mr. Moluski with you at that time?

9      A.   Yes, he -- yes, he was.  I mean, it's kind

10 of hard to sit here and tell you the exact day,

11 everything that happened that day because that was a

12 confusing time.  And I do remember after bringing the

13 application back, I didn't review that.  I should

14 have reviewed some of the stuff before I came.

15     Q.   Did Mr. Moluski ask you to talk on the CB

16 on that first day?

17     A.   That was the only reason why I would be on

18 it, if he told me to do it.

19     Q.   And who did he ask you to contact?

20     A.   I don't remember who he said.  All I --

21 most times if you call on the CB, it's either to the

22 base or to another driver.  I think it was at the

23 base because the secretary said she understood what I

24 said.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

STANFORD L. BURRIS,          )
                             )
          Plaintiffs,        )
                             )    Civil Action
v.                           )    No. 04-1469 (SLR)
                             )
RICHARDS PAVING, INC.,       )
                             )
          Defendant.         )

     Deposition of DAVID MOLUSKI taken pursuant to
notice at the law offices of Aber, Goldlust, Baker &
Over, 702 King Street, Suite 600, Wilmington,
Delaware, beginning at 2:00 p.m. on Wednesday,
June 14, 2006, before Lucinda M. Reeder, Registered
Diplomate Reporter and Notary Public.


APPEARANCES:

          GARY ABER, ESQ.
          Aber, Goldlust, Baker & Over
            702 King Street, Suite 600
            Wilmington, Delaware 19801
            for the Plaintiff,

          MATTHEW P. DONELSON, ESQ.
          Elzufon Austin Reardon Tarlov & Mondell, P.A.
            300 Delaware Avenue
            Wilmington, Delaware  19899-1630
            for the Defendant.


- - - - - - - - - - - - - - - - - - - - - - - - - --
          WILCOX & FETZER, LTD.
   1330 King Street - Wilmington, Delaware  19801
                (302) 655-0477
                www.wilfet.com

W&F

**WILCOX & FETZER LTD.**
Registered Professional Reporters



**B36**

1    Q.    Did you do an interview of him?

2    A.    I took him for a road test.

3    Q.    That was not my question.

4    A.    I'm sorry.  Yes, I did do a interview.

5    Q.    What was the nature of the interview?  What

6    kind of questions do you ask during the interview?

7    A.    Basically, he came in.  I can't remember

8    exactly.  But I can tell you what I go through with

9    everyone.  Is that okay?

10    Q.    Okay.

11    A.    I ask them to come in, bring a copy of their

12    driving record.  Then I take them for a road test

13    consisting of:  We leave the parking lot.  They have

14    to do a pretrip on the truck.  I stand there and watch

15    them do their pretrip.  We get in the truck.  We drive

16    out the parking lot, up 141.  We go towards 95.

17    Circle around the ramp, come back down and pull back

18    into the parking lot.

19    Q.    It sounds like a fairly simple route.

20    A.    Yeah.  It's about five miles is what we do.

21    Q.    Did you do any interviewing asking questions to

22    get answers from him, any verbal --

23    A.    We spoke.  Just, basically, you know, where he

24    had -- what experience, you know, general stuff like,



1    you know, where did you work, you know, and then, you

2    know, why didn't you work why did you quit there, and

3    that sort of thing.

4        Q.    What is your impression of his experience?

5        A.    He told me that he worked, I think for -- it's

6    hard for me to remember.  Experience, you know,

7    well -- until -- the reason I take them on a driving

8    test is because what people tell me rarely backs up

9    what they actually do.  I get a lot of people that

10   tell me they can drive any truck -- they drove, can

11   operate any piece of equipment.  And they will come to

12   me and say, I've operated all sorts of equipment; I

13   can drive all sorts of machinery; I did this for so

14   and so.  They'll give names.  Rarely does it pan out

15   that they actually can back up what they say they can

16   do.  So that's why I take them on driving tests.  We

17   take operators out.  We take them out in the field and

18   put them on a piece of equipment, that sort of thing.

19       Q.    Before you took him for a road test, did he

20   describe his experience as a truck driver?

21       A.    I can't remember exactly, but we probably

22   chatted about that, you know.

23       Q.    Did you derive an impression of his experience

24   before you -- did you derive any feeling for his

1    Bellecor.

2      Q.    When you got back into the yard, you said you

3    didn't tell him whether he passed or failed the

4    driving test?

5      A.    That is correct.

6      Q.    What did you tell him about his driving?

7      A.    I can't remember word for word.  Generally, I

8    tell them I'll get back to them on it.

9      Q.    Did you tell him you have to talk to somebody

10   else?

11     A.    Generally -- well, I have to clear all new

12   hires between -- before I hire somebody, I have to get

13   approval from either Jeff or Richard, so.  Generally,

14   what I tell somebody is I will get back to them; I'll

15   let them.

16     Q.    Did you discuss the driving test with either

17   Jeff or Richard?

18     A.    I did not.

19            (Moluski Deposition Exhibit No. 1 was

20   marked for identification.)

21   BY MR. ABER:

22     Q.    I am handing you some documents which are

23   called the -- well, they're titled "Plaintiff's First

24   Set of Interrogatories Directed to Defendant, but



1    plaintiff was advised ..."  Do you see it?  Turn to

2    the page where there is one question -- do you see the

3    numbers of the questions?

4      A.    Yes.  I am looking at -- you said 13, correct,

5    right here?

6      Q.    Yeah.  Turn to the next page.  Your answer to

7    the question is on the next page.

8      A.    Okay.

9      Q.    It is sort of italicized language.

10     A.    Okay.

11     Q.    Skip the sentence that says, "By way of further

12   response."  Count up four lines from the bottom.  In

13   the middle of that line there is language "Rather,

14   plaintiff was advised ..."  do you see that?

15     A.    Okay.

16     Q.    The answer to that interrogatory states,

17   "Rather, plaintiff was advised on or about May 5th,

18   2003 that Mr. Moluski had to speak to his supervisor

19   before any decision could be made."

20     A.    Correct.

21     Q.    Is that a true statement?

22     A.    Yeah.  That's a true statement.

23     Q.    You told Mr. Burris that you had to speak to

24   your supervisors?



1    A.    That I have to run everything through Jeff and

2    Richard, yeah.

3    Q.    But that was not a true statement, was it?

4    A.    If I am going to hire somebody, I have to speak

5    to them.  That is what I do.

6    Q.    You didn't say there "in order to hire him";

7    you just said -- that statement says that you advised

8    Mr. Burris, the plaintiff, that you had to speak to

9    the supervisor before any decision could be made, not

10   a decision on hiring, but before any decision?

11   A.    This was several years ago.  I can't remember

12   my exact words on everything, so.

13   Q.    What I am trying to determine is the decision

14   not to hire him, you did not discuss that with anybody

15   else?

16   A.    I don't believe I did, no.

17   Q.    So that was your decision alone?

18   A.    Not to hire him?

19   Q.    Yes.

20   A.    Yes.  Because he could not handle the truck.

21   If somebody tears up a truck, then -- you know.

22   Q.    But the statement in answer to that

23   interrogatory is you had to speak to your superiors

24   before any decision was made is not an accurate



1    do I have to speak to them.

2    Q.    So that statement is not accurate if it means

3    any decision?

4    A.    That is correct.

5    Q.    Okay.  Now, what explanation did you want to

6    give me?

7    A.    Normally -- a lot of times when we have truck

8    drivers that insist they can drive and they can't

9    handle a dump truck, they have gotten violent,

10   screamed at me, told me they can drive a truck, called

11   me mother-fucker, all sorts of different things.  So I

12   have learned through the years to tell somebody that

13   be they're bad at something is mean.  So, basically,

14   what I tell them -- if they're a bad driver, I will

15   just tell them I can't -- I have to go talk to

16   somebody about it before I can make a decision.  So

17   that alleviates any conflict with them, so that there

18   is no -- but they generally know.  They have a feeling

19   when they've driven poorly.  You know, they don't --

20   Q.    Prior to Mr. Burris filing a charge of

21   discrimination against you, did you ever discuss with

22   either -- what's Jeff's last name?

23   A.    Thompson.

24   Q.    Jeff Thompson or Richard -- Mr. Richard's last



1    A.    I never spoke with him over a CB.

2    Q.    That was not my question.  Listen to my

3  question.

4    A.    Okay.  I'm trying to.

5    Q.    Did you test him to see whether he could be

6  understood on a CB or cell phone at any time?

7    A.    I did not test him, no.

8    Q.    Did you ask him to speak to anybody on a CB or

9  a cell phone?

10    A.    Did I -- I don't remember if -- I don't believe

11  so, no.  I can't remember.  I know he ... I don't

12  really know on that one.

13    Q.    After -- since the time that Mr. Burris took

14  the driving test, up until today, have you or anybody

15  at your direction ever contacted his former employers?

16    A.    I have never done that.  I cannot speak for

17  anybody else.  Not at my direction nobody has.  I have

18  not asked anybody to.

19    Q.    Do you have knowledge of anybody who has done

20  that?

21    A.    No, I do not.

22    Q.    Now, when you discussed the reasons that

23  Mr. Burris was not hired, you discussed it with

24  Jeff -- what was his name?  Do you have a last name?



1  give you an actual number.

2  Q.  Approximately.

3  A.  It floats up and down.  But I would say

4  probably in a year, a hundred, 150, somewhere in that

5  range.

6  Q.  So since 2003, you have had about five to 600

7  people apply for jobs?

8  A.  Yeah.  Some of them -- yeah, I'd say -- we run

9  from ads from time to time, you know.

10  Q.  Of those five to 600 people, how many get road

11  tests?

12  A.  We try -- anybody who wants to take one, takes

13  one, so-

14  Q.  Let's take the 150-a-year number you gave me.

15  Of the 150 people who apply each year, how many do you

16  road-test?

17          MR. DONELSON:  Are you talking about truck

18  drivers?

19  Q.  Yeah, truck-drivers.

20  A.  I road-test all truck-drivers before we fill

21  out their paperwork.  Before we even go through with

22  the DOT application, we take them for a test drive to

23  see if it's worth going any further.

24  Q.  So in the year 2005, you did about 150 road



1  on the crews other than truck driver since he applied?

2    A.    Oh, yeah.

3    Q.    Did you ever try and contact him and offer him

4  another job?

5    A.    For?

6    Q.    As a laborer.

7    A.    No, I did not.

8    Q.    What records do you have of his application?

9    A.    I don't believe we have any left.  I throw them

10  out when they fail.

11    Q.    So there is no written record of his

12  application whatsover?

13    A.    As far as I know, there is no written record.

14    Q.    So for determining what happened that day and

15  the reason he was not hired, it's based solely upon

16  your memory; correct?

17    A.    Correct.

18    Q.    If your memory is wrong, then what you have

19  answered in the interrogatories is wrong?

20          MR. DONELSON:  Objection.

21    Q.    Did you tell Jeff -- I keep forget his last

22  name?

23    A.    Thompson.

24    Q.    -- Thompson that the reason Mr. Burris was not



David Moluski

1  hired was that he flunked the road test?

2     A.    That is correct.  He did not pass his road

3  test.  That's why he was not --

4     Q.    Did you tell Mr. Thompson there was any other

5  reason that he was not hired?

6     A.    No.

7     Q.    It's your testimony today, to the best of your

8  recollection, Mr. Burris was never tested on either a

9  CB radio or cell phone as a part of his application

10  process?

11     A.    That is correct.  I never spoke to him on a

12  CB --

13     Q.    I didn't ask whether you spoke to him.

14     A.    I did not test.  I will say that.  I did not

15  test him on a CB radio or a cell phone.

16     Q.    Is there anybody else who would have conducted

17  that type of test?

18     A.    Not that I know of.

19     Q.    Is it possible Mr. Thompson might have called

20  him back for a second interview?

21     A.    No.  Jeff would not have called him back unless

22  I asked Jeff to do that.

23            MR. ABER:  All right.  I have no other

24  questions.  Thank you.



1   I don't know at the time that Mr. Burris called,

2   whether he called me on my cell phone or he called

3   into the office and I was at my desk or they got ahold

4   of me and I said, yeah, bring him in for a test.

5     Q.    Do you have any recollection of having any

6   difficulty understanding him if he called you on a

7   cell phone?

8            MR. DONELSON:  Objection.  He just says he

9   doesn't remember if he spoke to him.

10           MR. ABER:  If you want to object, object.

11  If I want the reason, I'll ask for it.  I don't want

12  speaking objections.

13           Would you read my question back, please?

14           (The reporter read as requested.)

15           THE WITNESS:  I don't remember talking to

16  him on a cell phone.

17  BY MR. ABER:

18    Q.    At any time when you met him and talked to him,

19  did you have any difficulty understanding him?

20    A.    You had to listen closely when he spoke.  I

21  don't know if you would consider that difficult.  But

22  you had to listen closely because his voice was very

23  soft.

24           MR. ABER:  I have no other questions.





WILCOX & FETZER LTD.
Registered Professional Reporters

**B47**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

STANFORD L. BURRIS,          )
                             )
          Plaintiff,         )
                             )    Civil Action
v.                           )    No. 04-1469
                             )
RICHARDS PAVING,             )
                             )
          Defendant.         )


          Deposition of JEFFREY THOMPSON taken pursuant
to notice at the law offices of Aber, Goldlust, Baker &
Over, 702 King Street, Wilmington, Delaware, beginning at
2:30 p.m. on Wednesday, July 19, 2006, before Eleanor J.
Schwandt, Registered Merit Reporter and Notary Public.


APPEARANCES:

          GARY W. ABER, ESQ.
          ABER, GOLDLUST, BAKER & OVER
            702 King Street
            Wilmington, Delaware  19801
            for the Plaintiff

          MATTHEW P. DONELSON, ESQ.
          ELZUFON, AUSTIN, REARDON, TARLOV & MONDELL, P.A.
            300 Delaware  Avenue - Suite 1700
            Wilmington, Delaware  19801
            for the Defendant




                    WILCOX & FETZER
      1330 King Street -  Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com



WILCOX & FETZER LTD.
Registered Professional Reporters

COPY

**B48**

1   not done.  In the same respect, let me finish my question

2   before you jump in with an answer.  All right?

3       A.   Yes.

4       Q.   Okay.  By whom are you employed?

5       A.   Richards Paving, Inc.

6       Q.   In what capacity?

7       A.   I am the president.

8       Q.   And how long have you held that position?

9       A.   Two years.

10              MR. ABER:  Off the record.

11              (Discussion off the record.)

12      Q.   How long have you been employed by Richards

13  Paving?

14      A.   Approximately 16 years.

15      Q.   And was that your family business before you got

16  into it?

17      A.   No.

18      Q.   You started the company?

19      A.   No.

20      Q.   Did you buy it from somebody?

21      A.   No.

22      Q.   What is the alternative?  How did you get it?

23  Give me a third alternative.

24      A.   I was hired by the owner.

1    A.    I didn't know I needed to bring it.

2    Q.    Okay.  Do they still exist?

3    A.    I don't know.

4    Q.    Would you have just destroyed them?

5    A.    I may have.  I'm not even sure how old this case

6 is.  Is it three years old.  I really don't know.

7    Q.    The Department of Labor made its findings on

8 April 30th, 2004.

9    A.    So it is more than two years old.

10    Q.    A little over two years, yes.

11    A.    I don't know if I still have anything or not.

12 Again, everything was very informal, as they had notified

13 me.

14    Q.    Mr. Burris made an allegation of discrimination

15 against your department.  You understand that?

16    A.    Yes.

17    Q.    And the Department of Labor contacted you, both

18 verbally and I guess in writing, wanting to know your

19 version of why he wasn't hired?

20    A.    Yes.

21    Q.    What did you tell them?

22    A.    I told them that I did not know.  In fact, I did

23 not even know who he was.

24    Q.    So you provided them no information?



**WILCOX & FETZER LTD.**
Registered Professional Reporters

**B50**

1    A.    That is correct.

2    Q.    And nobody else from your company provided them

3  any information?

4    A.    Well, no.  I need to expand on that.  During this

5  phone call prior to receiving a written letter, I was

6  told that I would be getting a letter, I needed to be

7  aware of what this was, what was happening, and I would

8  need to respond to it on an informal basis.

9    Q.    Did you respond to it?

10    A.    I did.  And I was told that in my response I

11  needed to explain what had happened.  I didn't know what

12  had happened.  I told them I did not know what had

13  happened.

14    Q.    Okay.

15    A.    And I was told to make sure I fleshed out my

16  response, to do it on an informal basis, and that that

17  would be the end of it.

18    Q.    Did you write a response?

19    A.    I did.

20    Q.    Before you wrote the response did you consult

21  with anybody?

22    A.    No, I did not.  Again, there was no need to, as

23  far as I knew, because this was done informally.  I

24  didn't even know who Mr. Burris was at that time.



1          Q.    You understood he was making a charge of

2    discrimination for not being hired?

3          A.    Correct.

4          Q.    And you didn't know who he was from Adam?

5          A.    Correct.

6          Q.    And you were going to have to explain to the

7    Department of Labor your company's position as to why he

8    was not hired?

9          A.    On an informal basis, yes.

10         Q.    Well, informal, formal, it doesn't matter?

11         A.    It makes a very big difference, if I may disagree

12   with you.  That's a very, very big difference.

13         Q.    What is the difference?

14         A.    On an informal --

15         Q.    You would tell the truth in either case, wouldn't

16   you, whether it was formal or informal?

17         A.    I would tell the truth.  But on a informal,

18   casual basis, there is a very big distinction between how

19   you are going to address an issue and whether that issue

20   is going to be used at a future date.

21         Q.    What is the difference?  Explain to me.  Because

22   to me, if somebody makes an inquiry, you tell them the

23   truth.  You can do it informally or you can do it

24   formally, but the content of the response would be the

1  truth in either case.  Would you agree with that?

2      A.   I believe, Mr. Aber, you made the perfect example

3  I would use right here when you asked to speak off the

4  record and asked about a paving inquiry.

5      Q.   Well --

6      A.   If you allow me to finish, that was a perfect

7  example I would use, speaking off the record is exactly

8  what happened in this case.

9      Q.   When you speak off the record do you not tell the

10  truth?

11      A.   When I speak off the record do I not tell the

12  truth?

13          MR. DONELSON:   Object to form.

14      Q.   Let me rephrase it.   When you speak to someone

15  off the record do you lie?

16      A.   No, I do not lie.

17      Q.   When you speak off the record do you tell the

18  truth?

19      A.   If I understand the facts, yes.   If I understand

20  the facts.

21      Q.   When you speak off the record do you make up

22  things out of your imagination?

23      A.   I can.

24      Q.   Would you have made up a reason for his



1    tell me that DelDOT is awful, I forget the exact word you

2    used, but you wouldn't tell me that unless you really

3    thought there was some problems with DelDOT, would you?

4        A.    Now I'm confused.

5        Q.    So am I.   That makes two of us, and I think I'm

6    more confused than you.   I'm trying to understand that

7    when you are talking off the record, do you tell the

8    truth or do you make things up?

9        A.    I think we can address your question more

10   specifically by getting to the point of what I believe

11   you are asking.

12       Q.    I'll get to my point.   I'm asking you to answer

13   my question.   When you talk to somebody off the record

14   and tell them something, are you telling the truth or are

15   you lying to them?

16       A.    At any time, in any situation, in any

17   circumstance in my entire life?

18       Q.    Let me put it is to you this way:   When you talk

19   to a government agency, the State of Delaware, would you

20   lie to them?

21       A.    At any time, under any condition, under any

22   circumstance?

23       Q.    Yes.

24       A.    I might.



**B54**

1    Q.   You realize that might be construed as perjury?

2    A.   Not if I have been told that it is informal and

3    not if I have been told it will be kept in strictest

4    confidence between two individuals and they are not

5    acting as a government agent in this respect.

6    Q.   Would you have lied to the Department of Labor?

7    A.   If I were told that it is informal and it would

8    be kept in the strictest of confidence and they are not

9    acting as a government employee at this time, I may have,

10    I may have -- no, I would not have lied, no.  I would not

11    have lied.

12           I would have, I would have followed their

13    instructions and have tried to present information to

14    them that would have put my company in the best of light.

15    Q.   Did anybody at the Delaware Department of Labor

16    ever inform you that you were talking off the record and

17    it would never be repeated?

18    A.   Yes.

19    Q.   Who told you that?

20    A.   I do not remember the person's name.

21    Q.   Does Melinda Sheldon sound correct to you?

22    A.   Melinda Sheldon I believe is the person to whom I

23    addressed the letter, but I do not believe that is the

24    person to whom I spoke to initially.



1       Q.    When you wrote, when you addressed the letter to

2   Melinda Sheldon, were you speaking informally or

3   formally?

4       A.    I don't know.    That was simply a person I was

5   told to address the letter to.

6       Q.    Were you telling the truth in that letter?

7       A.    I don't know.

8       Q.    You might have lied in the letter to the

9   Department of Labor?

10      A.    I don't know.    This was --

11      Q.    When you learned, when you were contacted by the

12  Department of Labor, and the Department of Labor told you

13  that Mr. Burris had filed a claim of discrimination

14  against your company, you told me originally you didn't

15  know him from Adam, correct?

16      A.    Right.

17      Q.    By the time you had responded in writing to the

18  Department of Labor, had you made inquiries about who he

19  was to find out what the whole story was?

20      A.    No.

21      Q.    So when you responded to the Department of Labor

22  you had no knowledge of who Stanford Burris was?

23      A.    That is correct.

24      Q.    Did you know whether he was black or white?



1    A.    No.

2    Q.    Did you know whether he was short or fat?

3    A.    No.

4    Q.    Did you know if he had any disabilities?

5    A.    No.

6              (Thompson Deposition Exhibit 1 was marked

7    for identification.)

8              THE WITNESS:  Is that the same thing?

9    BY MR. ABER:

10    Q.    Yes.  Give that to your lawyer.  Do you recognize

11    the document that's been marked Thompson 1?

12    A.    No, I do not.

13    Q.    This is the official findings of the Department

14    of Labor.  Now, let me explain some terminology to you.

15    In this you will see the terms the "Department of Labor,"

16    that's the Department of Labor who got the complaint.

17              You will see the term "charging party,"

18    that means Mr. Burris because he filed the charge.

19              You will also see the term "respondent,"

20    Richards Paving, Inc. is the respondent.

21              Do you understand that?

22    A.    Mm-hmm.

23    Q.    Let's go through the document.  The document says

24    that on May 9th Mr. Burris filed a charge of

1   discrimination against Richards Paving, Inc.

2            Do you have any reason to doubt that?

3       A.   No.

4       Q.   Okay.  Under "Reasonable Cause Findings" it

5   states, "On April 30th, 2004, the Department of Labor

6   concluded its investigation and now finds, based on the

7   following facts, that there is reasonable cause to

8   believe that a violation of the State Discrimination Act

9   has occurred."

10           That's their thoughts.  You don't have to

11  speak to that.

12           Under Roman Numeral I it lists "Undisputed

13  Facts."  The first undisputed fact is, "Charging Party

14  applied for a Truck Driver position with Respondent on or

15  about April 3rd, 2003."

16           Do you understand what that sentence means?

17      A.   Yes.

18      Q.   Do you have any reason to disagree with it?

19      A.   I don't know whether he did or did not.

20      Q.   Well, the second sentence under "Undisputed

21  Facts," Roman Numeral I states, "Respondent had an

22  interview with Charging Party where the interviewer and

23  Charging Party attempted to communicate using both a CB

24  radio and a cell phone in an attempt to find a reasonable



1    accommodation to Charging Party's disability."

2    Do you understand that sentence?

3        A.    I understand what it says.

4        Q.    Do you have any reason to believe that is a false

5    statement?

6        A.    I don't know whether he did or he didn't.

7        Q.    You don't know one way or the other?

8        A.    That's correct.

9        Q.    Thirdly, "Respondent did not hire Charging Party

10   for this position."

11               Do you understand what that means?

12       A.    Yes.

13       Q.    Do you have any reason to agree or disagree with

14   that?

15       A.    I, I now know he was not hired.  I did not know

16   it at the time.

17       Q.    Did you ever discuss Mr. Burris with Mr. Moluski?

18       A.    Not, not concurrent with the case.  Only now.

19       Q.    Now, the second, Roman Numeral II is "Disputed

20   Facts," that means that there is a dispute between what

21   the charging party, Mr. Burris said, and with what the

22   respondent, Richards Paving says.  Do you understand?

23       A.    Yes.

24       Q.    The sentence one under Roman Numeral II states,



1    "Charging Party states that the representative of

2    Respondent stated Charging Party was not being hired

3    because of his voice."

4                Do you understand that sentence?

5        A.   Yes.

6        Q.   Do you have any reason to agree or disagree with

7    that?

8        A.   I don't know.

9        Q.   The next sentence says, "Respondent," meaning

10   Richards Paving, "Respondent further stated that Charging

11   Party could not be heard over the CB radio and therefore

12   could not be hired as a Truck Driver."

13               Do you understand that sentence?

14       A.   Yes.

15       Q.   Do you have any reason to agree or disagree with

16   it?

17       A.   I don't know.

18       Q.   Okay.  Now, this is my question:  You are the

19   only person from Richards Paving that you know of who has

20   communicated with the Department of Labor?

21       A.   Yes.

22       Q.   Where would the Department of Labor have gotten

23   that position, that statement made by Richards Paving?

24       A.   If someone else from Richards Paving responded to

1    them that I don't know of, or --

2         Q.    Did you --

3         A.    Okay.  Or from the letter that I submitted to the

4    Department of Labor, based upon what I was told to do by

5    the individual who initially contacted me.

6         Q.    If it is in the letter that you responded by --

7         A.    Mm-hmm.

8         Q.    -- would you have been telling the truth in that

9    letter about that statement?

10        A.    I was told to defend the statements made by Mr.

11   Burris in a matter that would be most effective for

12   Richards Paving, and if I did that, this case would go

13   away.

14        Q.    They said it would go away?

15        A.    Yes.  It was a very informal, off the record

16   matter, and it would go away.

17        Q.    So there is a possibility that you stated, on

18   behalf of Richards Paving, that Mr. Burris could not be

19   heard on the CB radio and, therefore, would not be, could

20   not be hired as a truck driver?

21        A.    I don't know.  I would have to refer to what I,

22   what I said.  I don't know.

23        Q.    You weren't involved in the interview or testing

24   of Mr. Burris, were you?

1  informed that this was an off the record, casual response

2  that was designed to make this case really go nowhere.

3      Q.   Did you receive a copy of what is marked Thompson

4  1?

5      A.   I don't remember it, no.

6      Q.   Would it have gone to anybody other than Richards

7  Paving?

8      A.   From April 30th, '04?  From more than two years

9  ago, I don't remember it.  I could have.  I don't

10 remember.

11     Q.   Just so I understand your testimony, is it your

12 testimony that you made a formal statement, in writing,

13 to the Department of Labor, explaining why Mr. Burris was

14 not hired, and in that response you made up a story that

15 you didn't know was or was not true?

16          MR. DONELSON:   Object to the form.

17     A.   No, that is not correct.

18     Q.   When you wrote to the Department of Labor, an

19 official branch of the State of Delaware government, did

20 you tell the truth?

21     A.   When I wrote an informal, off the record letter,

22 under the direction of an employee of the State of

23 Delaware, who guided me as how -- as to how the letter

24 should be addressed and written, I responded in a fashion



WILCOX & FETZER LTD.
Registered Professional Reporters

**B62**