IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STANFORD L. BURRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.: 04-1469 (SLR) |
| | ) | |
| RICHARDS PAVING, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE FOR REMITTITUR**

The plaintiff, Stanford L. Burris, responds to defendant's post-trial motion seeking a judgment as a matter of law and/or remittitur separately as follows:

I.    **Motion for Judgment as a Matter of Law**

A.    **The Applicable Standard**:  In considering a party's motion for a judgment as a matter of law, following a jury verdict, the evidence should be viewed in a light most favorable to the non-moving party, here, the plaintiff, with all reasonable inferences drawn in favor of the nonmovant.  Jaguar Cars, Inc. v. Royal Oakes Motorcar, Co., 46 F.3d 258, 269-70 (3d Cir. 1995).  For the defendant, here, Richards Paving to prevail on its motion it must show that the evidence presented at trial, and all reasonable and justifiable inferences from such evidence, do not afford any rational basis for the jury's verdict Delli Santi v. CNA Ins. Cos., 88 F.3d 192, 200 (3d Cir. 1996).  A court considering a motion for a judgment as a matter of law, after a jury verdict, should not weigh the evidence or determine the credibility of the witnesses, or substitute its version of the evidence and facts for the jury's version.  Lightening Lube, Inc. v. Witco, Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).  In considering the defendant's motion for a judgment as a

matter of law, following an adverse jury verdict, the appropriate inquiry is to review the record to determine if it is "...critically deficient of the minimum quantum of evidence from which the jury might reasonable afford relief." Simone v. Golden Nugget Hotel & Casino, 844 F.2d 1031, 1034 (3d Cir. 1988).

> "If the evidence and justifiable inference most favorable to (the plaintiff) affords any rational basis for the verdict, the judgment as a matter of law is inappropriate...The Court may not weigh the evidence or pass on the credibility of witnesses, or replace its version of the facts for that of the jury." Finch v. Hercules, Inc., 941 F.Supp. 1395, 1409 (D.Del. 1996) (internal citations omitted).

**B.**    **The Evidence Relied Upon By the Jury**:    This matter was presented to the Jury alleging a violation of the "Americans With Disabilities Act" ('ADA"), in violation of 42 U.S.C. §§12102(2)(c)and 12112, with the argument that the defendant had regarded the plaintiff as disabled, because of his loss of larynx and difficulty in speaking.  The defendant argues that: "...the evidence does not support any rational basis for the verdict." (Defendant's Motion ¶5).   To substantiate that claim, the defendant erroneously argues that: "...there is no evidence or testimony that the plaintiff was given any radio test during his interview." (Defendant's Motion ¶13). As a result, the defendant argues that: "...it is impossible for a jury to return a verdict that the plaintiff was perceived as disabled if he cannot prove the plaintiff was ever given a radio test." (Id.).

In making its arguments, the defendant ignored the clear testimony in this case. Mr. Burris testified on several occasions that he was given a test on the CB radio, and was told that he would not be hired because the defendant could not hear him on the CB radio:

> - - - "...he said to me, I really don't think we could use you because of of your voice, because I didn't think we could hear you on the CB" (T-

78, L-14-16).[1]

- - - "...we went to another truck that was in the yard - - and I didn't remember at deposition, but after I started reading some of the record again, I remembered we did - - I did talk over the CB, as a matter of fact this truck here is equipped with a CB and phone and I have no trouble talking. " (T-78, L-17-22).

--- "Q. When you were tested on the CB who did you talk to?

    A. Had me call back to the base.  I talked to the - - the receptionist, the lady that gave me the application." (T-78-79, L-25-2).

--- "Q. After you finished that, did he indicate whether you would be hired as a truck driver.

    A. No he said he wouldn't use me because of my voice. (T-79, L-4-6).

The language for which the defendant relies upon in claiming that there was no evidence that Mr. Burris spoke on the radio, was the use of selective excerpts from Mr. Burris' deposition used during cross examination (Defendant's Motion ¶¶8 & 9, quoting T-95-96).  However, in doing so, the defendant ignores the further testimony of Mr. Burris, offered under the provisions of Rule 32 (a)(4), Federal Rules of Civil Procedure, where, later in that same deposition, Mr. Burris clearly stated he had been tested on a CB radio, as shown not only during his court testimony, but during his prior deposition testimony:

--- "My answer was: Oh, yeah.  I remember, yeah. I remember that, yes. the secretary - - I took that back.  She has said that I talked on the CB and she could understand what I said. I remember that now." (T-105, L5-6, quoting p. 53 of Mr. Burris' deposition[2]).

--- "I said I did, so, yes, I did. (T-105, L-15-16; quoting Mr. Burris' deposition at p. 54, Lines 13-17 in response to a question by defendant's counsel, stating that he had not used a CB on either day).

---

[1]    Excerpts of the Trial Transcript are denoted "T- ", and are attached hereto as Exhibit No. 1

[2]    The excerpts of the quoted portions of Mr. Burris' deposition are attached hereto as Exhibit No. 2.

--- "Q. And then he asked: Who did you speak to on the CB?

A. The girl in the office, it would have to be because we were - - we always call back to the base.

       *      *      *      *      *

--- "Q. and then on page 56 of your deposition, he continued the questioning and said: And on the second day - - we're at line 2. On the second day you didn't use a CB on the second day is that correct.

A. Not that I remembered, I think it was all the first day, I believe. (T-106, L-2-8, 23-24; referring to Mr. Burris' deposition at p. 55-56).

---"Q. And where was the truck located when you supposedly used the CB?...

A. It was in the yard.

Q. And on Line 54 you  - - or at line 2 on the next page 58, he answered: You can answer...

A. It was in the yard, because I didn't drive the second day." (T-107, L-7-15; quoting Mr. Burris' deposition at p. 57-58).

Not only was there clear evidence by which a jury could have believed Mr. Burris' testimony that he was tested on the radio, and that the defendant told him he would not be hired because of his difficulty in being understood on the CB radio, the convoluted attempts by the defendant's witnesses to deny an admission made to the Department of Labor, was further convincing evidence upon which the jury could have rested its verdict. It should be recalled that Jeffrey Thompson, the then president of Richards Paving, testified that he was the only person on behalf of Richards Paving that communicated with the Department of Labor, and no one else from Richards Paving dealt with the Department of Labor (T-135-136).  Mr. Thompson then acknowledged that he had been told by the Department of Labor, that Mr. Burris had been asked to use a CB radio and that he could

not deny that information (T-136), could not dispute that statement (T-137), nor could he give any other reason for Mr. Burris not being hired (T-137). It was basically Mr. Thompson's sworn testimony, that he did not know, since as he again testified, that nobody at Richards Paving had ever given him the reason why he wasn't hired, he responded to the Department of Labor (T-137). The jury had ample evidence in which to disbelieve Mr. Thompson's testimony when a representative of Richards Paving, David Moluski, was confronted with his deposition testimony that, after Mr. Burris filed the charge of discrimination, he was aware of the charge, and he did discuss with Jeff Thompson, the reasons why Burris wasn't hired. Specifically, before the jury, Mr. Moluski was confronted with the following testimony from his deposition:

> "Q.    Line 4, Page 30 you are asked: After the charge of discrimination was filed - - what did you answer?
>
> A.    It says, yeah, it would have been - - I would have gone over - - Jeff would have called me into his office and I would have gone over it with Mr. Thompson. That is correct." (T-150; quoting Mr. Moluski's deposition at p. 30). [3]

When confronted with that testimony Mr. Moluski attempted to equivocate by stating that he didn't understand the difference between charge of discrimination and lawsuit, and that he was confused, although he admitted not being confused at the time of his deposition. (T-151).

Clearly, there was sufficient testimony for the jury to conclude that Mr. Burris was tested on a CB radio. What the jury was confronted with, was a decision of the credibility of the witnesses. The credibility of Mr. Burris had to be weighed against the credibility, or lack of credibility of Messrs. Thompson and Moluski. The jury performed its duty, heard

---

[3]    Excerpts of Mr. Moluski's deposition are attached as Exhibit No. 3.

the evidence, weighed the evidence, and chose to believe the version of the facts as testified to by Mr. Burris, and to reject the testimony of Messrs. Thompson and Moluski. That is, the jury performed its primary function as the tryer of fact. Fineman v. Armstrong World Indus. Inc., 980 F.2d 171, 211 (3d Cir. 1992).

**II.    Defendant's Motion for Remittitur:**

A.    **No Reduction is Justified:**  Contrary to the defendant's argument that it is impossible for the Court to determine how much of the damage was compensatory, and what part of the damage was for back pay (Defendant's Motion ¶19), the opposite is true.  The jury verdict was in the amount of $120,480.  As the Court will recall the testimony of Mr. Moluski clearly established the foundation for the claim of lost wages.  Mr. Moluski testified either at trial, or was confronted with his deposition testimony as to the following facts:

1.    Richards Paving drivers were laid off just before Christmas (T-152-153) and they returned to work in March or April (T-154).

2.    When working, the drivers worked about 50 hours per week with 10 hours of overtime each week (T-154-155).

3.    The rate of pay they were receiving was $11 to$12 an hour. (T-154).

4.    The amount of layoff was 12 to 16 weeks each year (T-157-158).

5.    The mid point for layoff was 14 weeks (T-158).

6.    Mr. Burris applied for the job with Richards on April 30, 2003, but was turned down in early May 2003 (T-75).

7.    Mr. Burris was not able to find work in 2003 (T-80), and was not able to find work until he obtained a job with Daisy Construction at the end of October 2004 (T-83)

Thus, the argument was made to the jury that Mr. Burris lost weekly earnings of $632.50 for 64 weeks for a total of $40,480.[4]

Thus, it becomes clear that the amount of damages awarded to Mr. Burris were $40,480 in lost wages, for the period of time that he was denied employment, and $80,000 pain and suffering.  It is submitted that the pain and suffering claim warrants the award, given the fact that, as Mr. Burris testified, that the denial of work to him had significant consequences.  Not only did it make him feel "...less than a man." (T-86), but as he also testified "...he felt that his whole world had stopped." (Id.).  In addition, his wife left him because of the mounting bills, bill collectors calling, and his lights were turned off (T-86).  Further, because he had, after surgery, submitted himself to a Chapter 13 bankruptcy proceeding, he had scheduled payments to make on his house, but, because he could not find work, and specifically having been denied employment by Richards Paving he could not keep up his payments and he lost his house (T-86-87).  Thus, there is ample evidence by which a jury could find that Mr. Burris suffered significant emotional stress and suffering proximately resulting from the denial of employment by Richards.  Namely, the loss of his manhood, the loss of his wife, and the loss of his home.  Clearly, the loss of those portions of a man's life would have catastrophic effects on his psychological well being.  The mere fact that the jury's verdict is on the generous side, is not sufficient grounds to warrant the granting of a remmittitur, nor does it permit the Court to substitute its judgment for that of a jury.  Goico v. Boeing Co., 358 F.Supp.2d 1028, 1030 (D.Kan. 2005), especially where the

---

[4]    Attached hereto as Exhibit No. 4 is the calculation of damages, which were shown to the jury in closing arguments, and given to the Court, prior to such argument, as required by its pretrial proceeding rulings.

defendant fails to provide any principled manner of reducing the verdict. <u>Bates v. Board of Education of the Capital School District</u>, 2000 WL 376405 (D.Del. 2006) at p. 11.

B. **<u>Application of Statutory Cap</u>**: The defendant is correct that damages recoverable under the "Americans With Disabilities Act" are subject to a statutory cap, 42 <u>U.S.C.</u> §1981(a)(2) & (b)(3). However, in this case, except for the defendant's naked allegation that the statutory cap applies (Defendant's Motion ¶8), there is no evidence to support the defendant's claim that it is a company with "...fewer than one hundred employees...". Id.[5] Without appropriate evidence presented to this Court, the Court is not permitted to speculate as to the number of employees of Richards Paving. <u>Haynes v. State of Florida</u>, 1998 WL 271460 (S.D.Fla. 1998)(refusing to strike a claim for compensatory damages due to a lack of evidence as to the number of employees employed by the defendant).[6]

WHEREFORE, the plaintiff requests this Court to deny the defendant's Motion for Judgment as a Matter of Law and/or for Remittitur.

---

[5] It must be noted that the statutory cap on damages does not apply to claims for back pay, as they are excluded from the cap calculation. 42 <u>U.S.C.</u> §1981(b)(2), which allows relief under 42 <u>U.S.C.</u> §2000(e)-(5). Relief under that section, 42 <u>U.S.C.</u> §2000(e)-(5) is specifically included under the enforcement provisions of the "ADA", 42 <u>U.S.C.</u> §12117(a).

[6] With regard to the defendant's claim for application of the "cap", it may be possible that there are other companies so interrelated with Richards Paving as to affect the number of employees (See Moluski Testimony, T-152)

Respectfully Submitted,


_____/s/ Gary W. Aber_____
GARY W. ABER (DSB #754)
Aber, Goldlust, Baker & Over
702 King Street, Suite 600
P.O. Box 1675
Wilmington, DE  19899
(302) 472-4900
Attorney for Plaintiff


DATED:   December 19, 2006

# EXHIBIT 1

1

```
 1                        - VOLUME A -

 2              IN THE UNITED STATES DISTRICT COURT

 3              IN AND FOR THE DISTRICT OF DELAWARE

 4                          - - -

 5    STANFORD L. BURRIS,          :       CIVIL ACTION
                                   :
 6              Plaintiff          :
                                   :
 7         vs.                     :
                                   :
 8    RICHARDS PAVING INC.,        :
                                   :
 9              Defendant          :       NO. 04-1469 (SLR)

10                          - - -

11                             Wilmington, Delaware
                               Monday, December 4, 2006
12                             9:25 o'clock, a.m.

13                          - - -

14    BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

15                          - - -

16    APPEARANCES:

17         ABER, GOLDLUST, BAKER & OVER
           BY:  GARY W. ABER, ESQ.
18
                Counsel for Plaintiff
19

20         ELZUFON AUSTIN REARDON TARLOV & MONDELL
           BY:  MATTHEW P. DONELSON, ESQ.
21
                Counsel for Defendant
22

23

24                             Valerie J. Gunning
                               Official Court Reporter
25
```

1    A.    It was in May of 2003.

2    Q.    Okay.  According to our records, you went and applied

3    about April 30, 2003.  You went in for an interview in the

4    early part of May 2003.  Does that sound about right?

5    A.    That's about right.  Yes.

6    Q.    How did you learn about the job?

7    A.    Newspapers.  The newspaper.

8    Q.    All right.  And when you saw the ad in the newspaper,

9    did you contact Richards Paving?

10   A.    It was a number on there.  They didn't say exactly the

11   name of the company.  I called the lady at Richards Paving

12   Company and I asked for directions.

13   Q.    And you went in to apply?

14   A.    Yes, I did.

15   Q.    Explain to us, if you would, what happened during that

16   application process.  You went in.  Did they give you

17   something to fill out?

18   A.    Yeah.  The receptionist or the secretary, she gave

19   me the application to fill out.  I filled the application

20   out.

21              Could I get some water?

22   Q.    You need some water?

23   A.    Please.

24              (Mr. Aber handed the witness a cup of water.)

25              THE WITNESS:  Thank you.

Burris - direct                          78

1    A.    Yes.  He said everything was fine.

2    Q.    And did you -- how did you think the driving was?  Did

3    you have any trouble driving that truck?

4    A.    Mr. Aber, I've been driving since I was eight years

5    old.  That's all I've been around, trucks.  I thought I did

6    wonderful.

7    Q.    Okay.  And what happened after you finished the driving

8    test?

9    A.    Well, he told me, asked me for my driving record, which

10   I didn't have.  I had to go to the department the next day to

11   get a copy.  So I got a copy, I came back.  I started giving

12   it to him.

13          He was saying, I don't think -- before he looked

14   at -- before he took the application, he said to me, I really

15   don't think that we could use you because of your voice,

16   because I don't think we could hear you on the CB.

17          And if I remember correctly, we went to another

18   truck that was in the yard, and I did -- I didn't remember at

19   deposition, but after I started reading some of the record

20   again, I remember we did -- I did talk over the CB.  As a

21   matter of fact, this truck here is equipped with a CB and

22   phone and I have no trouble talking.  If I get lost, that's

23   what I do.

24   Q.    We'll get to that in a minute.

25          And when you were tested on the CB, who did you

1   talk to?

2   A.    Had me call back to the base.  I talked to the -- to

3   the receptionist, lady that gave me the application.

4   Q.    And after you finished that, did he indicate whether

5   you would be hired as a truck driver?

6   A.    No.  He said he couldn't use me because of my voice.

7   Q.    And what did you say?

8   A.    I started begging him for a job.  I told him, if he

9   can't hire me as a truck driver, give me any kind of job.  I

10  would do any kind of work.  I needed it because I told him I

11  was in the process -- I was about to lose my house and all my

12  bills were behind and I really needed the job.

13  Q.    And what did he say?

14  A.    He said no, he just couldn't use me.

15  Q.    Did you talk to anybody else at Richards Paving other

16  than the receptionist and Mr. Moluski?

17  A.    No.  That was it.

18  Q.    Did you ever talk to a Jeffrey Thompson?

19  A.    No, sir.

20  Q.    Now, after it turned out that you are not going to

21  be hired by Richards Paving, did you continue to look for

22  work?

23  A.    Yes, I did.

24  Q.    And what did you do to look for work?

25  A.    I went to a lot of companies, construction companies.

1          My voice, I think it turns a lot of people off

2    when I start talking, because the jobs that are going to be

3    available when I get there, but then after they start talking

4    to me, it seems like it kind of them off.

5    Q.   What companies did you apply to or go to look for jobs

6    at?

7    A.   You got a list of all the companies.

8    Q.   Try with your memory, if you can remember.

9    A.   Mostly every construction company that was here in

10   Delaware, that's here in Wilmington.  I even went to the

11   mayor.  Let me start over again.

12          I went to Diamond.  Went to J.T. Ward.  I went to

13   George & Lynch.  I can't pronounce the other companies name,

14   but it's down in Newark.  It's M-k-l-i-u-s.  I can't

15   pronounce the name.  I went there.  I went to Nautica.  I

16   went to -- there's a lot of companies.  You have a list of

17   them.

18   Q.   Were you able to find work?  During the remainder of

19   2003, were you able to to find work?

20   A.   No, not in 2003, no.

21   Q.   And were you able to find work in 2004?

22   A.   Yes.  Finally, I found a job at Daisy.

23   Q.   And what kind of work do you do at Daisy?

24   A.   Drive a truck.

25   Q.   Okay.  Let me show you what is being marked

1    going to be hired by Richards Paving, how did that make you

2    feel?

3    A.    Made me feel less of a man.

4    Q.    I'm sorry.  I didn't understand you.

5    A.    I said it made me feel less than a man.  I felt

6    terrible.  I felt like my world had just stopped because I

7    knew if I got this job, this would solve a lot of financial

8    problems.

9    Q.    And after you were turned down this job, you were

10    out of work, I believe you testified, until November of

11    2004.

12              What happened to you during those 15 or 16

13    months?

14    A.    Well, my wife left.

15    Q.    And why did she leave?

16    A.    Because she got tired of...

17    Q.    Tired of what?

18    A.    We couldn't keep the bills paid.  Bill collector was

19    calling.  They turned the lights off and stuff.

20    Q.    What happened to your -- what happened to your house

21    during that period of time?

22    A.    Well, when I first had the operation, I had to go under

23    Chapter 13, because I -- I was on a schedule and I think I

24    was about three or 4 months behind when I applied for

25    Richards Paving.  If I could have gotten that job, I could

1  have kept my house.

2  Q.   Can you take your hand away from your mouth?

3  A.   I could have kept my payments up and I would never have

4  lost my house.

5  Q.   When you went to work for Daisy Construction, you

6  testified they started you off at $14.50 an hour.  Then you

7  got a raise to $15 an hour.

8        Do you have any health insurance benefits there?

9  A.   No.  We have no benefits at all.

10 Q.   And what are the -- not hours, what is the time period

11 that you generally work?  What months of the year?

12 A.   Probably from April until in December.

13 Q.   And is that customary in the construction trade, to be

14 laid off, let's say, between December and April for the

15 winter months?

16 A.   No.  Not all the companies, but it is with them,

17 because they don't seem to have that much work at that time

18 of year.

19 Q.   At any time were you ever told the reason you weren't

20 hired by Richards Paving was that they felt you were not

21 qualified or that you had flunked the driving test?

22 A.   No, sir.  I never heard it until after they started

23 investigating stuff.  That's when I heard it.

24        MR. ABER:  I have no further questions at this

25 time, your Honor.

1    your deposition.

2    A.    Yes, sir.

3    Q.    And at line 2, you're giving an answer to a question.

4    Read that answer from line 2 through line six.

5    A.    My answer was:  Oh, yeah.  I remember, yeah.  I

6    remember that, yes.  The secretary -- I took that back.  She

7    had said that I talked on the CB and she could understand,

8    understand what I said.  I remember that now.

9    Q.    Okay.  And go over to Page 54, starting at line 13.  --

10   or Line 17.

11        Mr. Donelson asked you the following question:

12   And just so I'm clear, is it your testimony that on the first

13   or second day, you didn't use the CB on either day?

14        And you answered?

15   A.    I remember after I saw -- I said I did, so, yes, I

16   did.

17   Q.    Then he asked you:  Well, I'm not asking you if you

18   guess you did.  I'm asking you if your recollection says you

19   did.

20        On the next page, Page 55, what did you answer?

21   A.    If the statement said I did, I did.  I just don't

22   remember.  That's all.  But I do remember having a

23   conversation with the secretary.

24   Q.    Then he asked you:  Okay.  And what did you say on the

25   CB, if you --

Burris - redirect                                106

1    A.    I don't remember.

2    Q.    And then he asked:  Who did you speak to on the CB?

3    A.    The girl in the office, it would have to be, because we

4    were always -- we always called back to the base.

5    Q.    And then on Page 56 of your deposition, he continued

6    the questioning and said:  And on the second day -- we're at

7    line 2.  And on the second day, you didn't use a CB on the

8    second day; is that correct?

9               What did you answer?

10   A.    Where are you, Mr. Aber?

11   Q.    You're now on line 4, Page 56.

12   A.    Yes, I was.  I was in two different trucks.

13   Q.    No, no.  Go back.  The question he read at line 2

14   on Page 56 is -- this is Mr. Donelson speaking:  And the

15   second day, you didn't use a CB on the second day; is that

16   correct?

17              And then you answered at line 4.

18   A.    Two different trucks.

19   Q.    On Page 56.

20   A.    56?  I'm sorry.  See what I mean?

21              Not that I remember.

22   Q.    Keep going.

23   A.    Not that I remember.  I think it was all the first day,

24   I believe.

25   Q.    Then he asked you the question:  The first day now,

1    your testimony now is that the first day, you used a CB?

2              And you answered?

3    A.    That's when I think I used it, because I gave him the

4    driving record, and he said he couldn't use it.

5    Q.    Okay.  Then, if you would go over to Page 57, down at

6    the very bottom, you were asked the question by Mr. Donelson

7    at line 21:  And where was the truck located when you were

8    supposedly using the CB?

9              And you answered at line 24:

10   A.    It was in the yard.

11   Q.    And at line 54, you -- or at line 2 on the next page,

12   58, he answered:  You can answer.

13             And then at line 4, you said what?

14   A.    It was in the yard, because I didn't drive the second

15   day.

16   Q.    So reading those, in your deposition testimony when

17   Mr. Donelson was questioning you, did you tell him that

18   you spoke on a CB during this process at Richards Paving?

19   A.    Yes, the second day, but I just got it a little mixed

20   up.  That's all.

21   Q.    And when you were asked some questions about electronic

22   voice box that you had, when you use an electronic voice box,

23   where do you hold it?

24   A.    You hold it upside of the neck or under the chin.  The

25   vibration of your --

Thompson - direct                    135

1                    (End of sidebar conference.)

2    BY MR. ABER:

3    Q.    Mr. Thompson, just so we're clear, you responded on

4    behalf of the Department of Delaware inquiry on behalf of

5    Richards Paving?

6    A.    Yes.

7    Q.    You were the only person from Richards that

8    ever communicated with the Delaware Department of

9    Labor?

10   A.    To the best of my knowledge.

11   Q.    Turn to Page 19 of your deposition.  At line 18, I

12   asked you the question:  Okay.  Now, this is my question.

13   You are the only person from Richards Paving that you know of

14   who communicated with the Department of Labor.

15            You answered?

16   A.    Yes.  I did not know what has happened since I left the

17   company.

18   Q.    Right.  I am talking about from the time prior to your

19   leaving the company.

20   A.    Yes.

21   Q.    You are the only one that communicated with the

22   Delaware Department of Labor?

23   A.    Yes.

24   Q.    No one else from Richards dealt with the Department of

25   Labor, did they?

Thompson - direct                    136

1   A.    Yes, that's correct.

2   Q.    And all information concerning this event, as far as

3   the Department of Labor was concerned, came from you?

4   A.    Yes.

5   Q.    Okay.  Now, I've handed to you a document which

6   has three things at the top of it.  The first section we

7   talked about, uncontroverted facts, read those to yourself,

8   please.

9              (Pause.)

10             THE WITNESS:  Okay.

11  BY MR. ABER:

12  Q.    Now, does that refresh your recollection of what

13  you communicated with the Department of Labor since you

14  were the only one that could have provided these facts to

15  them?

16  A.    To a certain degree, yes.

17  Q.    Okay.  And having your recollection refreshed, do you

18  remember what you told them about Mr. Burris having been

19  asked to use a CB radio?

20  A.    Well, they actually told me that he had used a CB

21  radio.

22  Q.    And did you deny that?

23  A.    I told them I didn't know.

24  Q.    Okay.  So that was an undisputed fact, wasn't it?

25  A.    I don't know.  They told me.

Thompson - direct                137

1   Q.    You did not dispute that, did you?

2   A.    That's correct.

3   Q.    And you didn't give them any other reason for him not

4   being hired, did you?

5   A.    I didn't know.

6   Q.    All right.

7   A.    And I was not asked to address any other issue.

8   Q.    So it's your testimony that nobody at Richards Paving

9   ever gave you the reason why Mr. Burris was not hired?

10  A.    Oh, I know why he was not hired.

11  Q.    No.  Let me back up.  At the time you responded to the

12  Delaware Department of Labor, it's your testimony nobody had

13  told you why he wasn't hired?

14  A.    That is correct, because I was asked to respond on an

15  informal basis.

16         MR. ABER:  Thank you, sir.  I have no other

17  questions.

18         THE COURT:  All right.  Cross-examination, Mr.

19  Donelson.

20                   CROSS-EXAMINATION

21  BY MR. DONELSON:

22  Q.    Good afternoon, Mr. Thompson.

23  A.    Good afternoon.

24  Q.    I just have a couple of questions for you.  You never

25  met with Mr. Burris; is that correct?

Moluski - direct                    150

1    there's something missing, it says yes.

2    Q.    It's not missing.  It's two dashes.  It means you

3    paused.

4    A.    Okay.  Thanks for the legal education.  I can use

5    all the help I can get.

6              I would have discussed it with them once I

7    was made aware.  There were some charges as to that.

8    Q.    Okay.  By charges, we we were discussing the charge

9    of discrimination with the Department of Labor?

10   A.    I'm not a legal expert.  When I said charges, I

11   don't know if it was for the legal lawsuit or Department

12   of Labor.

13   Q.    All right.  Turn to Page 30 of your deposition, at

14   line 4.

15   A.    Hold on.  I've got to get to page 30 first.

16   Q.    I'm sorry.

17   A.    You're rushing me.

18              All right.  I'm there now.

19   Q.    Line 4, Page 30, you were asked:  After the charge of

20   discrimination was filed -- what did you answer?

21   A.    It says, yeah, it would have been -- I would have gone

22   over -- Jeff would have called me into his office and I would

23   have gone over that with Mr. Thompson.  That is correct.

24   Q.    And then, Question:  Did you participate in preparing

25   any documents for the Delaware Department of Labor in

Moluski - direct                    151

1    connection with these proceedings?

2              You answered?

3    A.    Not that I can recall.

4    Q.    Did you attend any meetings with the Delaware

5    Department of Labor in connection with this proceeding?

6    A.    No, I did nothing prior to the lawsuit.

7    Q.    It doesn't say lawsuit there, does it?

8    A.    Must have lost my place.  It says, I did nothing.  No,

9    I did nothing.

10   Q.    And at that point you were discussing what was done

11   after the charge of discrimination, weren't you?

12   A.    A little confused.

13   Q.    Go back up.  The first question:  After the charge of

14   discrimination was filed?  You answered that you went in and

15   talked to Jeff in his office about it.

16   A.    I don't know whether it was -- when you are saying

17   charge of discrimination, I might be confusing that with a

18   lawsuit.  I'm not a technical person.  That's not my area.

19   Q.    You didn't say that in your deposition you were

20   confused, were you?

21   A.    I didn't know I had to say that.

22   Q.    You -- okay.  Let's change the subject for a minute.

23              At your facility, how many companies are there

24   that work as Richards Paving?

25   A.    What do you mean by company?

Moluski - direct                    152

1   Q.    Is it one company or more than one company that's

2   Richards Paving?

3   A.    It's Richards Paving.

4   Q.    Is there more than one Richards Paving?

5   A.    It has numerous endeavors.  I don't get involved with

6   all of them.

7   Q.    Do any involve trucking?

8   A.    All of the trucks I see are owned by Richards Paving.

9   Q.    Does Richards -- are there any other trucks that have

10  Richards something on them?

11  A.    There's other companies that are Richard Smith,

12  Richard -- all kinds of different companies have different

13  kinds of Richards on it.

14  Q.    Drive the same dump trucks as Richards Paving?

15  A.    Most of Richards dump trucks say Richards Paving.  One

16  or two might say refined products.

17  Q.    Richards Paving has at all times four drivers?

18  A.    We try to.

19  Q.    Okay.

20  A.    During the wintertime, we have to lay people off.

21  Q.    Those four are not among the ones you layoff, are

22  they?

23  A.    Oh, yeah, they are.

24  Q.    Okay.

25  A.    Last year, we laid everybody off.

Moluski - direct                              153

1   Q.    And generally, you lay people off around April -- or

2   you lay them off just before Christmas, don't you?

3   A.    Yes.  It depends on the weather.  When it gets cold, we

4   have to start our layoffs.  Asphalt is a hot product.  It has

5   to get down in the ground quickly.  So we have temperature

6   constrains constraints.  Last year we started laying off

7   before Thanksgiving.  If you remember, we had that freak

8   snowstorm.

9   Q.    You testified in your deposition you generally lay off

10  in December or January.

11  A.    I testified in deposition that we lay off in December

12  or January, typically before Christmas.  Last year I

13  testified that we laid off before Thanksgiving.

14  Q.    All right.  And your truck drivers, when they

15  are not laid off, they work about 50 hours a week,

16  don't they?

17  A.    It all depends on the weather.  If it's not raining,

18  they work -- we try to, depending on the time of year

19  also.

20            In spring, we limit their hours to 40, 45.

21  As we get busy during the summer months, we relax that.

22  Then, once we go into the winter months, we -- we don't try

23  to work too much overtime.

24  Q.    Okay.  Turn to Page 9 of your deposition.

25  A.    Okay.

Moluski - direct                              154

1    Q.    You were asked a question, line 3:  When employees are

2    working, even seasonal work, how many hours a week do they

3    generally get?

4              What did you answer?

5    A.    It's says, On the average, we're somewhere right around

6    50.  Try to keep them to 45, but they usually end up with

7    50.

8              It says, Depending on --

9    Q.    Then there was a question:  So they can have ten hours

10   overtime?

11             And you answered?

12   A.    Usually ten hours a week overtime.  Sometimes it can

13   run more, though.

14   Q.    All right.  And they're laid off -- usually, you said,

15   around Christmastime?

16   A.    Yes.  Usually around Christmastime we have to start our

17   layoffs.  As I said, it all depends on the weather.

18   Q.    When do they usually come back to work after layoff?

19   A.    When the weather clears up, usually March, April.

20   Q.    You testified in your deposition, Usually they leave

21   three, three and a half months a year on layoff?

22   A.    On average, that's correct, yes.

23   Q.    Okay.  And the rate of pay that you were paying back

24   then was 11 to $12 an hour in 2003?

25   A.    That is correct, for truck drivers.

Moluski - direct                    155

1   Q.    You're paying 11 to $12 an hour.  50 hours a week;

2   correct?

3   A.    No, that's incorrect.

4   Q.    That's what you testified to, isn't it?

5   A.    Well, no, that's incorrect.  50 hours some weeks.  Some

6   weeks they might work 35.  Some weeks they might work 55.  It

7   all depends on the weather.

8   Q.    Turn back to Page 9 of your deposition.

9   A.    I'm on Page 9.

10  Q.    Where you testify under oath.

11  A.    Mm-hmm.

12  Q.    Can you show me anywhere in the answers to questions

13  on lines 3, 8 or 11, where you said sometimes 50?

14  A.    I see on average, on the average.  We were somewhere

15  right around 50.

16  Q.    The average is 50 hours a week?

17  A.    Goes up and down, depending on when it is.

18  Q.    The average is 50?

19  A.    I'm guessing.  My best guess.

20  Q.    Did you say best guess under oath when you testified?

21  A.    I believe so.  I don't know.

22  Q.    Well, see if you did.  I don't see the word "guess" in

23  there.

24  A.    Okay.  Let's see.  It says usually ten hours a week

25  overtime.  Sometimes it can run more.

1    Sometimes it can be more.

2    A.    That is correct.  Sometimes it can be less.

3    Q.    You didn't say that there, did you?

4    A.    I said on the average, so average means more than

5    less.

6    Q.    I'm talking about overtime.

7    A.    I can't control the weather.  You're asking me to --

8    Q.    I'm asking you -- I'm merely asking, sir, what you

9    testified under oath to and asking you to agree you were

10   telling the truth when you testified.

11   A.    I was telling the truth when I testified, but

12   I don't agree on your calculations, how you're doing

13   your calculations.  That's where we have a difference of

14   opinion.

15   Q.    And if they're laying off around Christmastime, on

16   average, and they go back to work in March or April, you say

17   that's usually three, three-and-a-half months, didn't you?

18   A.    Correct.

19   Q.    That's, by my calculation, between 12 and 16 weeks'

20   layoff?

21   A.    Yes.  You know, four months.  Four weeks in a month,

22   so...

23   Q.    12 to 16 weeks of layoff.  So if we pick a figure

24   somewhere in there, that says 14 weeks would be the average

25   layoff time; right?  That's halfway through 12 and 16;

Moluski - direct                     158

1    right?

2    A.    What you are -- well, you're telling me what it is.

3    Q.    You testified, you agreed with me about 12 to 16

4    weeks?

5    A.    That's right.  Every year is different.

6    Q.    And the midpoint is 14 to 16 weeks, isn't it?

7    A.    Last year I testified before Thanksgiving.

8    Q.    Sir, what was the question I asked you?

9    A.    You had me confused.

10   Q.    What's the mid-point between 12 and 16?

11   A.    That would be from highs school Algebra, 14.

12   Q.    Thank you.

13          Do your employees receive health benefits?

14   A.    Some do, not all employees.

15   Q.    Okay.  The ones that have been there working for more

16   than a couple years?

17   A.    They have to be hired as full-time seasonal.

18   Q.    And even full-time seasonal can be laid off --

19   A.    They can be laid off over the wintertime.  Everybody is

20   subject to layoff, whether you are salary or full-time

21   seasonal.

22   Q.    And those persons were getting health insurance

23   provided for them.  I believe you testified that that cost

24   Richards about 15, 12 to $1500 a month?

25   A.    Yes.  That's my estimate.  I'm not the one who handles

# EXHIBIT 2

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

Stanford L. Burris                    :
                                      :
        Plaintiff,                    :
                                      :
        v.                            :  C.A. No.
                                      :  04-1469-SLR
Richards Paving, Inc.                 :
                                      :
        Defendant.                    :

            Deposition of STANFORD L. BURRIS,

taken pursuant to notice before Adam D. Miller,

Registered Professional Reporter and Certified

Shorthand Reporter, in the law offices of Elzufon

Austin Reardon Tarlov & Mondell, P.A., 300 Delaware

Avenue, Suite 1700, Wilmington, Delaware, on

Wednesday, June 14, 2006, beginning at approximately

9:57 a.m., there being present:

APPEARANCES:

            ABER, GOLDLUST, BAKER & OVER
              One Customs House, Suite 600
              702 King Street
              P.O. Box 1675
              Wilmington, Delaware 19899-1675
            BY:  GARY W. ABER, ESQUIRE
            Attorney for Plaintiff


                CORBETT & WILCOX
          Registered Professional Reporters
    230 North Market Street     Wilmington, DE 19801
                (302) 571-0510
              www.corbettreporting.com

Page 53

1  other than Mr. Moluski?

2      A.   Oh, yeah, I remember, yeah.  I remember

3  now, yes.  The secretary -- I retake it back.  She

4  did say that I talked on the CB and that she could

5  understood -- understand what I said.  I remember

6  that now.

7              MR. ABER:  Thank you.  I have nothing

8  else.  We'll read and sign.

9              MR. DONELSON:  I'm just going to

10 redirect.  I'm --

11             MR. ABER:  Sorry.

12             THE WITNESS:  It's my fault.

13 BY MR. DONELSON:

14     Q.   Sir, I'm just trying to clarify this.  You

15 just testified to your attorney's questions that you

16 don't remember talking on the CB but you remember

17 having a conversation with the receptionist.

18             Is that your testimony?

19     A.   Yeah.  After I, after I reviewed the

20 records, because it's been since 2003.  I mean, there

21 has been so many other problems I've had:  losing my

22 property, everything being taken away.

23             It's kind of hard to remember

24 something that happened, what, three years ago?  I am

Page 54

1  64 years old.  My memory's not as good as it used to

2  be.

3       Q.   Where was the CB that you were speaking

4  from.

5       A.   I don't remember exactly where.  But it

6  wasn't in the truck when we took the road test.  I

7  remember that.  Because it wasn't -- I don't remember

8  a CB being in the, in the truck.

9       Q.   And we're referring to the second day,

10  because you've already testified that you didn't use

11  the CB on the first day.  We're referring to the

12  second day.  My question is, where did you use a CB

13  on the second day?

14       A.   I don't think I used a CB on the second

15  day.  That's when I was told to bring a copy of my

16  driving record back, which I did.

17       Q.   And just so I'm clear, is it your

18  testimony that on the first or second day, you didn't

19  use a CB on either day?

20       A.   I remember after, after I saw the -- I

21  said I did.  So I guess I did.

22       Q.   Well, I'm not asking you if you guess you

23  did.  I'm asking you if your recollection says you

24  did.

Page 55

1    A.    If the statement said I did, I did.  I

2 just don't remember; that's all.  But I do remember

3 it, having a conversation with the secretary now.

4    Q.    Okay.  What did you say on the CB, if

5 you --

6    A.    I don't remember.

7    Q.    Who did you speak to on the CB?

8    A.    The girl in the office.  It had to be

9 because we, we always called back to the base.

10    Q.    Well, on the second day, where were you

11 calling from that you were trying to reach the girl

12 in the reception area?

13    A.    I went into the office -- to make -- to be

14 honest with you, since we read the thing, I was at,

15 at Richards Paving now more than twice because I

16 went, because -- as I'm refreshed now, the girl did

17 tell me to come back.  She gave me the application.

18 I brought the application in, I believe.  That's when

19 I had the interview with a Dave or David.

20    Q.    I understand that.  We're talking about

21 the second day where you said you went back with the

22 driving record --

23    A.    Second day was all I did was give him the

24 driving record; that's when he said he couldn't use

Corbett & Wilcox

Page 57

1    believe it was the same day.  I'm not sure.  I can't,

2    I can't --

3         Q.   Is it your testimony now that you were in

4    two different trucks?

5         A.   Yes.  I was, I was in two different

6    trucks.  But I only took the road test in one truck.

7         Q.   What were you doing in the second truck?

8         A.   That's when he might have asked me to talk

9    on the CB.

10        Q.   And which day was that, the first or

11   second day?

12        A.   Sir, I can't remember.  I don't want -- I

13   want to be honest and complete.  I don't exactly

14   remember.  It's been, what, almost three, three

15   years, four years?

16        Q.   I appreciate that.  I understand you're

17   trying to give your best recollection.  The second

18   truck, what type of truck was that?

19        A.   I think it was a Mack.  I'm not sure.

20   Don't hold me to that.  I believe it was a Mack.

21        Q.   And where was that truck located when you

22   were supposedly using the CB?

23             MR. ABER:  Objection.

24             THE WITNESS:  It was in the yard.

Corbett & Wilcox

Stanford L. Burrois

1    BY MR. ABER:

2         Q.    You can answer.

3              MR. ABER:  Go ahead.

4              THE WITNESS:  It was in the yard.  It

5    was in the yard, because I didn't drive the second

6    day.

7    BY MR. ABER:

8         Q.    And was Mr. Moluski with you at that time?

9         A.    Yes, he -- yes, he was.  I mean, it's kind

10   of hard to sit here and tell you the exact day,

11   everything that happened that day because that was a

12   confusing time.  And I do remember after bringing the

13   application back, I didn't review that.  I should

14   have reviewed some of the stuff before I came.

15        Q.    Did Mr. Moluski ask you to talk on the CB

16   on that first day?

17        A.    That was the only reason why I would be on

18   it, if he told me to do it.

19        Q.    And who did he ask you to contact?

20        A.    I don't remember who he said.  All I --

21   most times if you call on the CB, it's either to the

22   base or to another driver.  I think it was at the

23   base because the secretary said she understood what I

24   said.

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

STANFORD L. BURRIS,       )
                              )
        Plaintiffs,     )
                              )  Civil Action
v.                      )  No. 04-1469 (SLR)
                              )
RICHARDS PAVING, INC.,     )
                              )
        Defendant.     )

    Deposition of DAVID MOLUSKI taken pursuant to notice at the law offices of Aber, Goldlust, Baker & Over, 702 King Street, Suite 600, Wilmington, Delaware, beginning at 2:00 p.m. on Wednesday, June 14, 2006, before Lucinda M. Reeder, Registered Diplomate Reporter and Notary Public.


APPEARANCES:

       GARY ABER, ESQ.
       Aber, Goldlust, Baker & Over
         702 King Street, Suite 600
         Wilmington, Delaware 19801
         for the Plaintiff,

       MATTHEW P. DONELSON, ESQ.
       Elzufon Austin Reardon Tarlov & Mondell, P.A.
         300 Delaware Avenue
         Wilmington, Delaware  19899-1630
         for the Defendant.


- - - - - - - - - - - - - - - - - - - - - - - - - - --

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware  19801
(302) 655-0477
www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters



1   A.    I didn't discuss it with Jeff because -- you

2   are talking about at what time?  I am not clear on the

3   question.

4   Q.    After the charge of discrimination was filed?

5   A.    Yeah.  It would have been -- I would have gone

6   over -- Jeff would have called me into his office, and

7   I would have gone over that with Mr. Thompson, that is

8   correct.

9   Q.    Did you participate in preparing any documents

10  for the Delaware Department of Labor in connection

11  with this proceeding?

12  A.    Not that I can recall.

13  Q.    Did you attend any meetings with the Delaware

14  Department of Labor in connection with this

15  proceeding?

16  A.    No.  I did nothing.

17  Q.    Other than discussing this matter with Jeff one

18  time, did you do anything with regards to the charge

19  of discrimination prior to the actual lawsuit being

20  filed?

21  A.    No, I did nothing prior to the lawsuit.

22  Q.    How many truck drivers apply for jobs at your

23  company on an annual basis?

24  A.    I can only give you a guesstimate.  I couldn't

# EXHIBIT 4

# LOST WAGE CALCULATION

$11-12/hr

50 hrs/wk

10 hrs-OT/wk

12-15 wks/yr Layoff

40 hr. ST Time/wk = $460 (40 x $11.50)
10 hr. OT Time/wk = $172.50 (10 x $17.25)

Total Weekly Earnings $632.50/wk

64 Weeks (5/5/03-11/3/04)  (78 wks – 14 wks = 64 wks)

Lost Wages (64 x $632.50) = $40,480

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that a copy of the attached pleading was hand delivered

and sent via electronic filing on December 19, 2006 to the following counsel:

Matthew P. Donelson, Esquire
Elzufon, Austin, Reardon,
  Tarlov & Mondell
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE  19899

/s/ Melissa A. Chionchio
Melissa A. Chionchio
Secretary to Gary W. Aber, Esquire

22